A. M. BELCHER, Appellant,

v.

The STATE of Texas, Appellee.

Mae BELCHER, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 46808 and 46809.

Court of Criminal Appeals of Texas.

Feb. 6, 1974.

Robert B. Maloney and David L. Loving, III, Dallas, for appellants.

Henry Wade, Dist. Atty., and W. T. Westmoreland, Jr., Asst. Dist. Atty., Dallas, Jim D. Vollers, State's Atty., and Buddy Stevens, Asst. State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

These are appeals from convictions for felony theft of money by false pretext. The punishment was assessed by the jury at ten years, probated.

The appellants contend that the evidence is insufficient and that the court erred in refusing to give an instruction on circumstantial evidence. We overrule these contentions and affirm the judgments.

Appellants contend that the evidence is insufficient to prove a false pretext or the intent to deprive the complainant of her money.

The complainant, Dovie Walling, an elderly Houston widow, met the appellants in 1960. A. M. and Mae Belcher, aged 70 and 76, respectively, introduced themselves to Mrs. Walling at the suggestion of a Mr. Roulette, a Las Vegas croupier who had formerly managed the Balanisian Room in Galveston, a club frequented by the three. The Belchers and Mrs. Walling saw each other several times during the next several years and became friends. Mrs. Walling became impressed with Mrs. Belcher's business ability. Mrs. Belcher had stated that she had been an independent oil operator for some forty years. The Belchers appeared to be wealthy by general appearance, their travels to various gambling places throughout the country, and a scrapbook of newspaper clippings shown to Mrs. Walling by Mrs. Belcher at their first meeting.

In December, 1966, the Belchers learned through an exchange of Christmas cards that Mrs. Walling's business manager had died. In January, 1967, Mrs. Walling made the first of three visits to the Belcher home in Dallas. There, the Belchers introduced her to James William Osborn, a long-time acquaintance of the Belchers. Mrs. Walling was very favorably impressed with Osborn, describing him as

"a very handsome man; he was beautifully dressed and had very lovely manners and he . . . was a man that I think any lady would be proud of."

During this first weekend, Mrs. Walling and Osborn apparently discussed a business venture involving an investment by her in certain oil property Osborn claimed to own in Oklahoma.

The following weekend, Mrs. Walling returned to Dallas with the intention to fly to Oklahoma to view Osborn's property. Bad weather postponed the trip but the transaction was consummated in the Belcher home on Saturday, January 14. Mrs. Walling gave Osborn a check for $20,000, dated January 16, and received an assignment agreement to purchase a five percent interest in the oil property.

Mrs. Walling made a final trip to Dallas the following weekend, where she was met by the Belchers, and the three then flew on to Tulsa, Oklahoma. They were met there by Osborn who took them on a tour of the oil field in which Mrs. Walling thought she had invested. The four then flew to Las Vegas for a few days and returned separately.

On January 20, Mr. Belcher introduced Osborn to the president of Preston State Bank of Dallas and Osborn opened a checking account, depositing the $20,000 check from Mrs. Walling. The collection request from Preston State Bank to Mrs. Walling's bank bore the notation,"Call Mr. Belcher EM8–6993 when paid."

The relationship between Mrs. Walling and Osborn continued to blossom. On February 27, Osborn deposited another $15,000 check given him by Mrs. Walling. On May 2, Mrs. Walling invested $3,000 more. On May 27, Osborn requested an additional $1,200; this time Mrs. Walling refused. In late February, Osborn had proposed marriage and Mrs. Walling accepted. However, in June, Mrs. Walling discovered Osborn was already married. Mrs. Walling never saw Osborn again after his final visit to Houston on May 3rd. Osborn, who was also charged with the offense, was arrested but failed to appear and his bail was forfeited. Later, he was apprehended in New Mexico, was permitted to make bail, and it was also forfeited.

During this period, other friends and acquaintances of Mrs. Walling were investing in the same Oklahoma property Osborn claimed to own. These "investors" were Dr. Andrew Kulaga, Mrs. Lee Cornelius, Mrs. H. Parr Armstrong, and Mr. and Mrs. Lloyd Gambrell.

Bank records introduced showed that Osborn wrote a $10,000 check to Good Earth Oil Company, drawn on his account with Preston State Bank and dated January 19, *one day before* the account was opened on January 20 with the deposit of Mrs. Walling's $20,000 check. Good Earth Oil Company is a family corporation wholly owned by the Belchers. On the 20th, Osborn's $10,000 check was endorsed by A. M. Belcher and deposited in the Good Earth account.

Osborn deposited Dr. Kulaga's $5,000 check on February 24, and on March 1 wrote a check to "cash" in the amount of $2,500. The check bore on its face the notation, "May Belcher." On February 27, Mrs. Walling's second check for $15,000 was deposited in Osborn's account. His March 3 check to "cash" in the amount of $7,500 bore the notation "Mae Belcher expenses." On March 6, Osborn deposited Dr. Kulaga's second check in the amount of $2,500; his check to "cash" for half that amount, dated March 10, bore the notation "for Mae Belcher." Also, on March 6, Mrs. Cornelius' $7,500 check was deposited and on the same day Osborn's check to "cash" in the amount of $3,750 bore the notation "Mae Belcher expenses." Mrs. Armstrong's $7,500 check was deposited on March 8. Osborn's check the next day was to "cash" again for half that amount and noted "Mae Belcher." The pattern finally breaks down with the March 20 deposit of the Gambrells' $18,750 check. Osborn's check to "cash" on April 4 also bore the notation "for Mae Belcher" but was in the amount of only $4,000.

It was stipulated that in the year 1967 Beard, Incorporated, was the sole owner of the Oklahoma oil field in which Osborn was purportedly seeking investors. The property, primarily depleted, at that time averaged a total production of 34 barrels per day, worth less than $3.00 per barrel.

Osborn held no interest in the property except an option to purchase on which he defaulted for lack of payment January 21, 1967.

Returning now to appellant's first contention that the evidence is insufficient to prove fraudulent intent on the part of the Belchers, both the prosecution and the defense succeeded in showing James William Osborn to be a thief who, by false pretenses, took Mrs. Walling's $20,000. The prosecution's theory was based on the law of principals and the jury was so charged. The defense was that the appellants did not act together with Osborn, and were without knowledge of his fraudulent intent.

Mrs. Walling testified to the following acts of the Belchers tending to establish their status as principals and their intent to appropriate her property: (1) Mae Belcher initiated the relationship between Mrs. Walling and Osborn by inviting her to Dallas to meet him, and by actually introducing them to each other in their own home; (2) the Belchers continually vouched for Osborn's character and business ability by verifying their long acquaintance with him, by urging that Mrs. Walling introduce him and his investment venture to her friends, by Mae Belcher's enthusiastic description of his wealth—"241 oil wells, 7 Cadillacs, and 2 airplanes," and by Mae Belcher's failure to inform Mrs. Walling that Osborn was married and had been previously married four times when Mrs. Walling asked her, and when she knew Mrs. Walling was romantically interested in Osborn; (3) the Belchers continually vouched for the merits of Osborn's business deal through Mae Belcher's enthusiastic description of the chances for its success—"It's like betting on a horse that's already won," by her repeated assertion that the Belchers would buy "all that he will let us have," by Mae Belcher's assertion on the morning of January 20 that she had gone to the bank to make arrangements for their purchase of an interest, by Mae Belcher's repeated assertions that she had, in fact, purchased an interest, and by

the Belchers' approving on-sight examination of the Oklahoma oil field; (4) the Belchers knew she had lost her own business manager, and that she was relying strongly upon their expertise and experience in the oil business and their own involvement in the venture; (5) A. M. Belcher assisted in the preparation of the assignment given her by Osborn and apparently feigned signing an assignment to the Belchers at the same time; (6) Mae Belcher continued telephoning Mrs. Walling after she had purchased an interest, reaffirming the Belchers' purchase of an interest and urging Mrs. Walling to buy more and get her friends to buy an interest; (7) Mae Belcher telephoned Mrs. Walling every time Osborn visited her in Houston. During one of these calls, Mae Belcher was talking to Osborn who, without mentioning it, handed the telephone to Mrs. Walling. Mrs. Walling heard Mae Belcher say (apparently still thinking she was talking to Osborn), "I can tear you down as fast as I built you up;" and (8) Osborn's statement that he had given Mrs. Belcher $44,000, part of which was from funds given him by Mrs. Walling.

Other witnesses, also investors in Osborn's oil venture, testified to essentially the same facts regarding the close and complementary working relationship between Osborn and the Belchers regarding investments in the Oklahoma field. Each testified that the Belchers stated that they owned an interest in the field and that the Belchers made the inspection trip to see the field.

A. M. Belcher testified that Osborn's $10,000 check to the Good Earth Oil Company account was in payment for money due him on a separate oil venture in which he and Osborn were partners, but which ended in a dry hole. Belcher was impeached on cross-examination when the State elicited testimony that his annual net earnings for 1965 and 1966 were $650 and $2000, respectively, and that he never used the United States mails because "it is a known fact that the government figures ev-

ery oil deal is a fraud" and so that he would not get in trouble with the federal government. Later, on re-cross, the State established that Belcher had in fact been convicted of mail fraud in 1936.

■ Although appellants gave testimony attempting to refute most of the damaging evidence related above, the jury is the sole judge of the truth of the facts alleged and no doubt chose to believe their testimony incredible. Taking the record as a whole, we find that there was sufficient evidence for the jury to find that both A. M. Belcher and Mae Belcher possessed the intent to appropriate Mrs. Walling's $20,000 and did appropriate at least $10,000 of her property, and did so by means of the false pretext of pretending to invest, knowing that she relied upon their superior knowledge of the oil business and the merits of the venture and would not have done so without their urging and recommendations and without their own investment in the venture. In so doing, they are guilty as principals with Osborn. See 55 Tex.Jur.2d, Theft, Section 64, page 339.

Appellants finally contend that the trial court erred in failing to charge on the law of circumstantial evidence.

■ An instruction as to circumstantial evidence is not required where the main fact is proved by direct testimony and only the question of defendant's intent is to be inferred from the circumstances. Hines v. State, Tex.Cr.App., 495 S.W.2d 252, 255; Helms v. State, Tex.Cr.App., 493 S.W.2d 227, 229; 31 Tex.Jur.2d, Instructions, Section 123, and cases cited therein. The testimony of Mrs. Walling regarding the statements made to her by the Belchers vouching for Osborn and the merits of the oil venture and the facts surrounding the signing of the assignment in the Belcher home and the presence of both A. M. and Mae Belcher was direct evidence of their participation in the false pretext of legitimate business venture. The testimony of the Preston State Bank official regarding the transfer of Mrs. Walling's $20,000

check to Osborn's account, and the subsequent $10,000 check to the Belchers' Good Earth Oil Company account was direct evidence of the appropriation of her property. See Morris v. State, Tex.Cr.App., 402 S.W.2d 161, 164. Therefore, with the exception of appellants' intent, each essential element of the offense was proven by direct evidence. As heretofore noted, it is the rule in such cases that where intent alone is determined by circumstances a charge on circumstantial evidence is not required. Schwartz v. State, 172 Tex.Cr.R. 326, 357 S.W.2d 393; Barber v. State, Tex.Cr.App., 462 S.W.2d 33, 35.

There being no reversible error, the judgments are affirmed.