John Dee MATSON, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 69635.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 16, 1991.

Stanley G. Schneider, Robert A. Jones, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. & Timothy G. Taft, Glenn Gotschall and Keno M. Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

A jury convicted appellant, John Dee Matson, Jr., of capital murder and the death penalty was assessed as punishment. On appeal to this Court, appellant raises forty-four points of error. We will address only those points concerning (1) the jurisdiction of this Court, (2) the sufficiency of the evidence to support the conviction and (3) whether the trial court abused its discretion in refusing to allow the jury to hear certain evidence during the punishment phase of trial. We will reverse the conviction.

In his first point of error, appellant claims that this Court is without jurisdiction because the trial court rendered judgment before the jury issued its verdict. He bases his claims on the fact that the jury foreman failed to sign the verdict form during the guilt/innocence phase of trial and when this was discovered, after the court had accepted the finding of guilt, the trial court made the jury go back into deliberation to sign the form. Thereafter, the judge did not re-pronounce sentence and appellant claims that such actions deny this Court jurisdiction. We disagree.

■ Filed among the court's papers is what purports to be a judgment and sentence whereby appellant was found guilty of capital murder and the death penalty was assessed as punishment. We assume jurisdiction over the appeal. Texas Constitution, Article V, Section 5. Appellant does not contest that the trial court had both subject matter and personal jurisdiction. If the trial court erred in sending the jurors back into deliberations in order to sign the verdict form, such would be trial error and would not affect the jurisdiction of the trial court or this Court. See generally, 49 C.J.S. *Judgments*, § 449 (1947 and Supp. 1990). Appellant's first point of error is overruled.

In four points of error, appellant insists that the evidence is insufficient to support the jury's finding of guilt. The indictment in this case alleged that appellant "while in the course of committing and attempting to commit the robbery of Phyllis Marie Hicks, intentionally cause[d] the death of Phyllis Marie Hicks, hereinafter styled the Complainant, by asphyxiating the Complainant by strangling her with his hands and by means to the Grand Jury unknown." A review of the evidence in the light most favorable to the jury's verdict is as follows:

On July 5, 1985, Phyllis Marie Hicks left her home at around 5 o'clock p.m. to go to a nearby food store. She drove the family 1978 Dodge van. Mrs. Hicks arrived at the food store and cashed a check for $378.00 for which she received one or two one-hundred dollar bills and the remainder in twenties and ones.

Later that same day, at sometime between 7:30 and 8:00 p.m., several persons saw appellant drive the Hicks' van into an apartment parking lot where Tores Doze was playing basketball with several others. Appellant called for Doze to join him and the two left in the van. They returned shortly thereafter. Appellant left. Between 9:00 and 10:00 p.m. that night, appellant returned to the apartment again to pick up Doze. While waiting for Doze, appellant told a boy that the van belonged to his uncle. Appellant and Doze left and went to a night club. While there the two picked up an acquaintance of Doze, Jim White, and the three went riding around Houston. When they stopped to get something to eat, White observed that appellant had about three hundred dollars—two one-hundred dollar bills and the remainder in twenties. White asked appellant where he had obtained the money and appellant replied, "I choked this lady and took it."

At around 3:00 a.m., the trio went home. On the way White started playing around by sticking his head out of the van. When he spotted a police car nearby, Doze told appellant that he better "get White hip."

That next morning at around 7:45 a.m., appellant checked into a motel. Appellant requested a room for twenty-four hours. He told the motel manager that he did not have a vehicle. After the manager checked in appellant, he noticed the Hicks' van parked on the nearby corner. The van had not been there the night before and this

aroused the manager's suspicion. The manager felt the hood of the van and discovered that it was warm. He then started to write down the registration and license plate numbers. While he was doing this, appellant walked by; the manager asked him if the van belonged to him and appellant responded that it did not. Appellant asked where the bus stop was located. The manager told him and appellant walked away. The manager then went to report the van to authorities keeping the van under surveillance while doing so. Before he could make the call, however, the manager saw appellant return to the van, get in and drive away. The manager followed. When appellant abandoned the van in an apartment parking lot, the manager phoned authorities. The police arrived but after running a check on the license plates they were unable to determine if the van had been stolen. The officers also checked if appellant had any outstanding warrants; he did not. They left the van and appellant alone.

At 10:00 a.m., maintenance workers discovered the nude body of Phyllis Hicks in an apartment dumpster. She had been strangled to death and her body had been covered with items from the van so as to conceal it.

There was evidence of sexual assault. An autopsy revealed that there was spermatozoa in the vagina. Pubic hairs were found in the van. Vaginal smears did not indicate secretor activity which is consistent with the male ejaculator being a nonsecretor. Appellant is a non-secretor.

Early on Sunday, July 7, 1985, after officers learned that before her death Hicks had been driving the van connected to appellant, he was arrested at the motel room. At the time of the arrest, appellant wore a gold chain belonging to Mrs. Hicks and there was $219.00 in cash in his pocket. The police found a shopping bag containing new clothes inside the room. The police also arrested Doze and discovered in his bedroom a radio head set belonging to Mrs. Hicks's son that had been in the van.

Authorities discovered appellant's palm print on the driver's manual that was inside the van. Also, appellant's fingerprint was found on an inside window. Doze's fingerprints were found on the back of the rear view mirror located on the passenger's side of the van.

Appellant specifically asserts that the evidence was insufficient to prove: (1) that he was the person that killed the complainant (point of error number fourteen); (2) that he intended the death of the complainant (point of error number fifteen); (3) the cause of the complainant's death was that as alleged in the indictment (point of error number sixteen); and (4) the manner of the complainant's death was that as alleged in the indictment (point of error number seventeen).[1] We disagree.

Appellant principally relies upon *Nathan v. State*, 611 S.W.2d 69 (Tex.Cr.App.1981), to support his contention that the evidence is insufficient to prove that he was the person who killed the complainant. Reliance upon that case, however, is seriously flawed. In *Nathan*, this Court applied an outmoded approach to reviewing the sufficiency of circumstantial evidence. Relying upon 24 Tex.Jur.2d, *Evidence*, § 742, the *Nathan* Court wrote:

"In criminal cases, a judgment of conviction, to be sustained on appeal, must be

1. Appellant was indicted for murder "in the course of committing and attempting to commit the robbery" of the complainant. In another paragraph, the indictment also averred that appellant killed the complainant "in the course of committing and attempting to commit kidnapping." Both allegations charge capital murder. See V.T.C.A., Penal Code, Section 19.03. In points of error numbers nineteen and twenty, appellant claims that he was denied rights guaranteed him under the Due Process Clause of the United State's Constitution. Specifically, appellant argues that the jury may have convicted him of capital murder during the course of kidnapping and, because these allegations were unsupported by the evidence presented at trial, he was denied his constitutional rights. We do not read this point of error to be a claim of insufficient evidence to support the conviction and consequently we will not address the merits of the claim. See *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). See also *United States v. Holguin*, 868 F.2d 201, 202–204 (7th Cir.), cert. denied, 493 U.S. 829, 110 S.Ct. 97, 107 L.Ed.2d 60 (1989).

supported by evidence that produces a moral certainty of the guilt of the accused to the exclusion of every reasonable doubt. The evidence will be insufficient to sustain the conviction where, although not leaving the accused free from suspicion of guilt, it still fails to show his guilt to a moral certainty, so as to exclude all reasonable doubt.

"In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent...." 611 S.W.2d at 75.

Once again, we disavow this language. See *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983) (opinion on rehearing); *Denby v. State*, 654 S.W.2d 457 (Tex.Cr.App.1983) (opinion on rehearing); *Freeman v. State*, 654 S.W.2d 450, 457 (Tex.Cr.App.1983) (opinion on rehearing); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinion on rehearing). When this Court is called upon to evaluate the sufficiency of evidence—in both circumstantial evidence cases and direct evidence cases—we determine "whether, after viewing the evidence in the light most favorable to the verdict, *any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in the original); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988); *Butler v. State*, 769 S.W.2d 234, 237 (Tex.Cr.App.1989). In *Moreno*, we further explained the correct way to apply the *Jackson* standard:

"... The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign or weigh evidence. This the factfinder has already done. The factfinder, best positioned to consider all the evidence firsthand, viewing the valuable and significant demeanor and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must

stand unless it is found to be irrational or unsupported by ... the evidence, with such evidence being viewed under the *Jackson* light. Concrete application of the *Jackson* standard is made by resolving inconsistencies in the testimony in favor of the verdict." 755 S.W.2d at 867 (footnote omitted).

In this case, among other facts showing that appellant committed the murder, we find the following to be significant: (1) appellant was seen driving the van that the deceased was last seen driving; (2) appellant admitted to another that he "choked this lady" and took her money; (3) appellant is found with about the same amount of money that the deceased was thought to have at the time of her death (when one includes the cost of the new clothing also found in appellant's possession); (4) appellant's palm and fingerprints are found inside the van; (5) appellant is wearing the victim's gold chain when he is arrested; (6) when asked appellant lies that he is not the driver of the van; and (7) forensic tests on the seminal fluid taken from the victim is at least consistent with sexual assault from a non-secretor and appellant is a non-secretor. From these facts, a jury's finding that appellant committed the murder of the complainant is perfectly rational.

Appellant's argument in support of his claim that the evidence is insufficient to prove that he intended to cause the victim's death is premised on what he asserts to be the "reasonable outstanding hypothesis" that appellant could have intended to cause a lesser injury whereby his intent was to subdue and merely incapacitate his victim and that the resultant death was unforeseen and unintended on his part. Here, appellant asserts that "it is well established that, in order to satisfy the *Jackson* standard, the state must disprove beyond a reasonable doubt all reasonable outstanding hypothesis raised by its evidence." Appellant's Brief at p. 72, citing *Wilson v. State*, supra.[2] He argues that it is just as

---

**2.** This is incorrect. The *Jackson* Court specifically held that the State need not disprove every outstanding hypothesis except that of guilt. 443 U.S. at 326, 99 S.Ct. at 2792, 61 L.Ed.2d at 578.

reasonable to conclude that there was an intent to merely subdue as it is to conclude that there was an intent to kill since there is no evidence which makes either conclusion more or less likely.

In *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App.1981), this Court abolished the requirement that a trial court provide the jury with an instruction concerning the weight to be given circumstantial evidence.[3] We reasoned that such an instruction rested on the untenable proposition that circumstantial evidence was less trustworthy than direct evidence. 646 S.W.2d at 197 (opinion on rehearing). We followed the Supreme Court of the United States which had earlier concluded:

"Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

This Court also found that "[a] charge which requires that the circumstances '... must exclude, to a moral certainty, every other reasonable hypothesis except the defendant's guilt ...' is a confusing and improper charge where the jury is properly instructed on the reasonable doubt standard of proof." 646 S.W.2d at 199–200, quoting from *Holland v. United States*, 348 U.S. at 140, 75 S.Ct. at 137 (1954).

The *Hankins* Court did not reach the issue of appellate review involving challenges to the sufficiency of the evidence, but the Court strongly hinted that there too, a separate standard for a circumstantial evidence case would be inappropriate. 646 S.W.2d at 200 n. 2. The issue was finally resolved in a succession of cases: *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983) (opinion on rehearing); *Denby v. State*, 654 S.W.2d 457 (Tex.Cr.App.1983) (opinion on rehearing); *Freeman v. State*, 654 S.W.2d 450, 457 (Tex.Cr.App.1983) (opinion on rehearing); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinion on rehearing). In these cases, we clearly established that when called upon to evaluate the sufficiency of evidence—in both circumstantial evidence cases and direct evidence cases—we determine "whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." The standard of review was taken from *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988); *Butler v. State*, 769 S.W.2d 234, 237 (Tex.Cr.App.1989). Nevertheless, the Court did not completely discard the "exclusion of outstanding reasonable hypothesis" test that had previously been applied in circumstantial evidence cases. Instead, the concurrence suggested that the test should remain as "one criteria" to be considered when applying the standard of review in circumstantial evidence cases. *Carlsen*, 654 S.W.2d at 450 (McCormick, J., concurring). The concurrence determined that "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding." *Id.* at 449. Notwithstanding the concurrence in *Carlsen* et al., there was no indication in either the majority opinion or the concurring opinion that this Court would,

---

See also *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

**3.** For over one hundred years, Texas criminal law required that a cautionary charge be given the jury in circumstantial evidence cases. Among other things, such a charge instructed the jury that it was to convict the accused only if the evidence excluded to a moral certainty every other reasonable hypothesis except the defendant's guilt. See *Hankins v. State*, 646 S.W.2d 191, 203 (Tex.Cr.App.1981) (Onion, P.J., dissenting) (tracing the history of the charge and the rules governing its use).

or should, extend the "exclusion of outstanding reasonable hypothesis" to an appellate sufficiency analysis to cases in which it had not been applied previously.

Case law preceding *Hankins* and *Carlsen* held that the circumstantial evidence charge was required to be given (and therefore the "exclusion of the outstanding reasonable hypothesis" test would be applied to review the sufficiency of evidence on appeal) only when circumstantial evidence was utilized to prove "the gravamen of the offense," "the act of the crime," "the main facts essential to guilt," and/or "the objective historical facts." See generally *Shippy v. State*, 556 S.W.2d 246, 249 (Tex.Cr. App.1977); *Stocks v. State*, 147 Tex.Crim. 164, 179 S.W.2d 305, 306–397 (1944) (opinion on rehearing). The charge was not required when the circumstantial evidence went to "psychological facts." *Shippy*, 556 S.W.2d at 246; *Stocks*, 179 S.W.2d at 308 (opinion on rehearing). Specifically, the case law established that a charge on circumstantial evidence was not required when the only issue to be determined through the utilization of circumstantial evidence was the defendant's intent. See *Shippy*, 556 S.W.2d at 249–250; *Green v. State*, 533 S.W.2d 769, 770–771 (Tex.Cr. App.1976); *Davis v. State*, 516 S.W.2d 157, 161 (Tex.Cr.App.1974); *Sloan v. State*, 515 S.W.2d 913, 917 (Tex.Cr.App.1974); *Belcher v. State*, 504 S.W.2d 858, 862 (Tex.Cr. App.1974); *Wagner v. State*, 463 S.W.2d 432, 434 (Tex.Cr.App.1971); *Barber v. State*, 462 S.W.2d 33, 35 (Tex.Cr.App.1971); *Stocks*, 179 S.W.2d at 305; *Jones v. State*, 34 Tex.Crim. 490, 31 S.W. 664, 664–665 (1895). But see *Hanks v. State*, 56 S.W. 922 (Tex.Cr.App.1900); *Shippy*, 556 S.W.2d at 250 n. 1. As the Court observed in *Shippy*, a capital murder case, "the established rule appears to strike a distinction between proof of the culpable act ... and proof of the mens rea ... and requires a circumstantial evidence charge only on circumstantial proof of the former." 556 S.W.2d at 250. See also *Stearn v. State*, 571 S.W.2d 177, 178 (Tex.Cr.App.1978) (in a burglary case where the only element to be proved circumstantially was the defen-

dant's intent when he entered the building, the circumstantial evidence charge was not required).

Whatever ambiguity there may have been in failing to give a circumstantial evidence charge in other cases, it was unequivocally established that in a murder case where the only issue was the defendant's intent to kill, the trial court was not required to give an instruction. The rule was early established that:

> "[T]he giving of a charge on circumstantial evidence is proper when the act which is claimed to be criminal is sought to be established by circumstantial testimony: but when the act is proved by direct testimony and all that remains to be found is the intent which accompanied the act, and which may be inferred from the circumstances accompanying the act, then this principle does not apply." *Russell v. State*, [38 Tex.Crim. 590] 44 S.W. 159, 161 (Tex.Cr.App.1898), quoting 2 Thompson, *Trials*, § 2505.

Subsequent homicide cases followed this rule without hesitation such that, in *Davis*, then Presiding Judge Onion dispensed with a claim that the trial court should have instructed the jury on circumstantial evidence by simply declaring that when the only issue to be proven circumstantially was the intent to kill, "a charge on circumstantial evidence is not required." 516 S.W.2d at 161 (thereafter citing several cases). The same holding is found in the following homicide cases: *Smith v. State*, 470 S.W.2d 696, 697 (Tex.Cr.App.1971); *Doswell v. State*, 158 Tex.Crim. 447, 256 S.W.2d 416, 420 (Tex.Cr.App.1953) (opinion on rehearing). See also *McClure v. State*, 272 S.W.2d 157 (Tex.Cr.App.1925).

■ Because prior case law would not have required an "exclusion of outstanding reasonable hypothesis" instruction to a jury when the only issue before it was the accused's intent to kill, it makes no sense, and we can think of no justification for a rule providing, that the "exclusion of outstanding reasonable hypotheses" analysis should be extended to test the sufficiency of circumstantial evidence relied upon to

prove an accused's intent.[4] Indeed, the judgment that the jury is called upon to make in the case before us—intent to kill—can by its very nature only be made upon consideration of numerous, various circumstances and at no time will such be absolutely assured. To require an appellate court to exclude every reasonable hypothesis concerning an accused's "intent" is simply unreasonable—who except the accused can absolutely determine his or her intentions? Reasonable alternative hypothesis concerning intent is almost assured to exist in any mind other than that of the accused. See *Shippy*, 556 S.W.2d at 250. An appellate court can assume nothing more than one intends the natural consequences of his acts but the court can never be absolutely sure of such. Consequently, serious application of the alternative hypothesis analysis to test the mens rea of the defendant would therefore lead to appellate reversal *and acquittal* in all but the rarest of cases. We cannot sanction such when it is clear that neither the Texas Constitution nor the United States Constitution requires us to do so. See *Jackson v. Virginia*, 443 U.S. at 326, 99 S.Ct. at 2793; *Holland v. United States*, 348 U.S. at 140, 75 S.Ct. at 137.

■ Consequently, in determining whether appellant, in the case before us, intended to kill the victim, our analysis of the sufficiency of the evidence to support the jury's finding will be guided by the standard that "a reviewing court, '... faced with a record of historical facts that supports conflicting inferences' must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Farris v. State*, 819 S.W.2d 490, 495 (Tex.Cr.App.1990), quoting in part from

*Jackson v. Virginia*, 443 U.S. at 326, 99 S.Ct. at 2793. We repeat so as to emphasize:

"The court is never to make its own myopic determination of guilt from reading the cold record. It is not the reviewing court's duty to disregard, realign or weigh evidence. This the factfinder has already done. The factfinder, best positioned to consider all the evidence firsthand, viewing the valuable and significant demeanor and expression of the witnesses, has reached a verdict beyond a reasonable doubt. Such a verdict must stand unless it is found to be irrational or unsupported by ... the evidence, with such evidence being viewed under the *Jackson* light. Concrete application of the *Jackson* standard is made by resolving inconsistencies in the testimony in favor of the verdict." *Moreno*, 755 S.W.2d at 867 (footnote omitted).

After aligning the facts in the light most favorable to the jury's verdict, we must then determine if "*any* rational trier of fact could find the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in the original). Our review of the record amply supports the jury's verdict that appellant intended to kill the complainant.

■ An internal examination of the neck organs revealed hemorrhaging into the mucosa of the larynx, below the vocal cords, caused by trauma to the neck; that is, the victim in this case was strangled to death. Granted, this type of injury evidences *at least* an intent to subdue but considering that appellant committed the offense against the mother of a classmate and a neighbor whom he was shown to have known and would fear could identify him

---

**4.** This conclusion is further supported by our continued adherence to the rule that in a prosecution for burglary with intent to commit theft, the jury may convict, and the appellate court may affirm that conviction, based on the inference that a burglar who breaks and enters into a home at night does so with the intent to commit theft. *Browning v. State*, 720 S.W.2d 504, 506 (Tex.Cr.App.1986); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Cr.App.1985). While such an in-ference is unquestionably a reasonable one, it is certainly not the *only* reasonable inference that one might draw from nighttime entry. Obviously, our continued reliance on this inference is inconsistent with the notion that the circumstances must *exclude* all alternative reasonable inferences inconsistent with the defendant's guilt. See also *Hardesty v. State*, 656 S.W.2d 73, 77 (Tex.Cr.App.1983) (inference of theft arising from possession of recently stolen property).

after a sexual attack, the natural inference is that the death was intentional and deliberate.

The jury in this case rejected any hypothesis that appellant merely intended to subdue his victim and that the death was an accident. The evidence does not suggest that the jury acted irrationally in so rejecting this hypothesis. Thus, we hold that the evidence is sufficient to prove that appellant intended the death of the complainant.

■ Appellant's argument that the evidence is insufficient to prove the cause of death as that alleged in the indictment—asphyxiation—is premised on testimony taken out of context from the statement of facts. Dr. Jordan, Assistant Harris County Medical Examiner, performed the autopsy on the victim. He testified that the internal examination indicated a 70 percent blockage of the coronary artery. In his questioning of the doctor, appellant's attorney asked, "Is it possible that sudden pressure on the neck could cause death in a diseased heart?" The doctor responded that such was "medically possible in this type of situation," and that this was known as "carotid sinus reflex or vago vagal response." Taking only this last remark, appellant claims that Dr. Jordan testified that the complainant's death was caused either by asphyxia or "cardiac arrest." As such, appellant concludes that the State failed to prove the manner of death beyond a reasonable doubt. A complete reading of the record, however, dispels appellant's claims.

Dr. Jordan was later asked, "In this instance of the carotid sinus reflex or vago vagal response being medically sound in this situation that you observed in Phyllis Marie Hicks, you said it is possible?" The doctor responded that it was possible but that it was medically unreasonable. As discussed above, Dr. Jordan determined that the cause of death was asphyxiation. He testified that his autopsy on the complainant found four cardinal signs of asphyxia: (1) hemorrhage within the eyes or membrane coverings; (2) congestion of the lungs; (3) fluid blood present in the body and (4) evidence of trauma. He specifically ruled out heart attack as the means of death. He felt that the cause of death was either manual or ligature strangulation causing hemorrhaging of the larynx resulting in asphyxiation. This same conclusion was reached by four other pathologists. In his expert opinion, Dr. Jordon found the cause of death to be "manual strangulation." The jury agreed and we hold that the jury's decision is supported by the evidence at trial and is rational.

Finally, appellant asserts that there is insufficient evidence to prove the manner of asphyxiation. Here, appellant premises his point of error on the lack of testimony from someone (either who sat on the grand jury or who presented the case against appellant to it) to substantiate the indictment's allegation that the cause of strangulation was "by means to the Grand Jury unknown." Appellant relies upon *Payne v. State*, 487 S.W.2d 71 (Tex.Cr.App.1972). Such reliance is misplaced.

■ When an indictment alleges that the manner or means utilized to inflict an injury is unknown and the evidence at trial does not show what type of object was used, a prima facie showing exists that the object was unknown to the grand jury. *Cunningham v. State*, 484 S.W.2d 906, 911 (Tex.Cr.App.1972); *Cox v. State*, 762 S.W.2d 710, 713 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd); *Salazar v. State*, 711 S.W.2d 720, 724 (Tex.App.—Corpus Christi 1986, pet. ref'd); *Washington v. State*, 677 S.W.2d 142, 145 (Tex.App.—Dallas 1984, no pet.). If, however, evidence at trial shows what object was used to inflict the injury, an issue is raised with respect to whether the grand jury had information, when it handed down the indictment, as to the object used. *Payne*, 487 S.W.2d at 72. Only in such a case, must the State prove that the grand jury did not know the manner or means of inflicting injury and that the grand jury used due diligence in its attempts to ascertain the manner or means. *Id.*[5] In the case before us, *Payne* is inap-

---

**5.** The State has the burden of proof on both the issue of whether the object was unknown and the issue of whether the grand jury utilized due diligence to ascertain its nature. Usually this is

plicable since all testimony introduced at trial demonstrated that the strangulation was accomplished either by the use of hands or by some other unidentified object.[6]

We conclude that the evidence is sufficient to sustain the conviction for murder in the course of robbery. Appellant's points of error numbers fourteen, fifteen, sixteen and seventeen are overruled.[7]

■ Appellant argues that the trial court erred when it refused to allow the jury to hear evidence from one of his witnesses. In the punishment phase of trial, appellant sought to introduce the testimony of Joe Harlin. Outside the presence of the jury, appellant's counsel elicited the following:

"Q. Do the recidivism rates differ for youthful offenders incarcerated for long periods of time?

"A. Well, naturally the highest recidivism rate is offenders 17 to 25 and thereafter; but your younger offenders—if they get a longer sentence naturally you're going to recidivate less, but usually the 35 or 30 to 35 age group recidivism rates fall off dramatically.

\*   \*   \*   \*   \*   \*

"Q. What is the recidivism rate of people based on the information you receive from dealing with the Parole Board and your experience with halfway houses and talking to inmates and youthful offenders who do short turnarounds?

"A. Well, short sentences—the worse you can do to a person is put them in prison and—if you threaten them with a prison sentence and you sent them down for four months, they lose all respect for the system. They figure they beat the system and, therefore, they have no fear whatsoever of committing another crime.

"Q. What is the recidivism rate do you know of short-term offenders?

"A. They say in the 17 to 25 age group I believe within a year about 30 percent return. Within three years that goes up to about 45 to 50 percent.

"Q. If the youthful offender is incarcerated for 15 or 20 years, what is the recidivism rate of a person being released from prison?

"A. The last figure I saw it drops down to about 15 percent. Most of the time they matured far enough that you don't do the same things.

"Q. As a person increases in age upon release from prison does the recidivism rate increase or decrease?

"A. Well, it decreases with age unless—well, that, too. Most time if you're still in the system by the time you get 30, if you get another sentence it's a long one and you stay incarcerated. So they're either in for a long period of time at that age or they've pretty well stopped.

"Q. ... [D]o you have an opinion based upon your experience in the criminal justice system, your personal experience, and your experience working in the halfway house system and based

done through the testimony of one of the grand jurors who sat on the case.

**6.** Dr. Jordan testified that he consulted with seven other doctors before making his conclusions as to the manner and means of the cause of death. These other doctors all agreed that asphyxiation was the cause of death; five believed that the manner of strangulation was either manual or ligature strangulation and the other two recommended that the manner of death be left undetermined. Further, Dr. Jordan testified that possible materials used as ligatures could be "anything ... a rope ... a telephone cord ... a scarf" or any other object which could be "placed totally around the neck and held tightly thus producing asphyxia."

**7.** Appellant claims in his eighteenth point of error, that the evidence is insufficient to prove that death occurred during the course of a kidnapping as alleged in the indictment. We do not reach this point since we find the evidence to be sufficient to sustain allegations that appellant killed the complainant in the course of robbery. See *Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex.Cr.App.1983) and cases cited therein (holding that when two underlying offenses are charged in an indictment for capital murder, the State need only prove one of the two offenses to support the conviction).

upon your membership in various associations and ... what you've learned as to whether or not a 17–year–old going to prison on a life sentence after 20 to 30 years incarceration—would there be a probability that he would commit criminal acts of violence?

"A. Well, no one can predict human behavior, but the probability should be low; and then, too, after that age they don't have to release you. You have to do something to earn that parole.

"Q. By earn release, what do you mean?

"A. Well, you just can't go to prison and sit. I mean, if you've got a long sentence you have to become—if you want out you have to become involved in either a school program or for something to better yourself. If not ..., they're not going to automatically release you.

"Q. ... [D]o you have an opinion based upon your experience as to what effect the school program or other programs at TDC have on individuals?

"A. In the most part it's positive, and even the school system—if they start off playing a game just to impress the Parole Board—you're there for a long period of time. They have up to a four-year college, and you gain something out of it even if you start off playing the game. You get the college, and you get to deal with people on an interpersonal basis, and I think it helps. Of course, you can go the other route, too. You can mess up all the time. and they will discipline you very severely over a long period of time or discipline itself tends to rehabilitate.

"Q. Now, based upon your experience the probability of future acts of violence constituting a continuing threat to society for a youthful offender incarcerated for 30—25 to 30 years, could you put a number on that?

"A. I would say it would be extremely low. I don't know that you could put a number on it.

"Q. And the longer a person stays in prison, would that probability of committing future acts of violence—would that decrease the longer the person is in prison?

"A. It should."

The State's attorney then questioned Harlin. Harlin readily admitted that he could not be specific about appellant's propensity to commit acts of violence in the future and he believed it to be impossible for anyone to predict how appellant will act. After the State's examination, appellant's attorney asked the following:

"Would you have an opinion if a person committed burglaries as a juvenile, stole a bicycle as a juvenile, stole bolt cutters as a juvenile, then robbed and kidnapped a woman, is accused of sexually assaulting another woman, then is convicted of robbery, kidnapping, murder possible sexual assault—would a person after 25 or 30 years in prison—whether or not that person would have a probability of committing future acts of violence after that 30–year period of time?"

To this hypothetical question, Harlin responded:

"I couldn't make a definite statement, but from all the statistics and all the studies that have been done the potential would be far less. You know, just from the standpoint he's older, that he's been out of society for a long period of time and disciplined over a long period of time tends to make you self-disciplined; and I feel that he would have a heck of a lot better control over himself at that time.

"Now again, I can't make that statement as for this specific person or you or me or—

"Q. You can't tell me what I'm going to do tomorrow.

"A. That's right. No one can predict behavior, but in general they've kept up with it for quite a few years, and the older the individual gets the less crimes he commits."

Appellant's counsel explained why he wanted the jury to hear Harlin's testimony:

"[H]e is an expert on ex-offenders, the ex-offenders programs and the effect of long-term incarceration of youthful offenders in the system ... and he can

give an expert opinion based upon his personal experience, his educational experience, his experience in halfway houses, his studies; and I believe that he is qualified to give an opinion on the probability, on question two."

The trial court, however, ruled that the testimony was inadmissible because, "I don't consider it to be relevant to the issue of whether or not there's a substantial probability that [appellant] will commit criminal acts of violence." Before this Court appellant claims, as he did in the trial court, that the trial court abused its discretion in not allowing the jury to hear this evidence. We agree.

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court declared the Texas death penalty statute constitutional. However, the Court premised its holding on the jury having before it, "all possible relevant information" about the individual defendant whose fate it must determine, 428 U.S. at 276, 96 S.Ct. at 2958, emphasizing that the jury "must be allowed to consider on the basis of all relevant evidence not only why a death sentence would be imposed, *but also why it should not be imposed.* 428 U.S. at 271, 96 S.Ct. at 2956 (emphasis added).

Examining the Ohio death penalty statute after *Jurek,* the Supreme Court in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), concluded that the Eighth and Fourteenth Amendments require the sentencing authority to not be statutorily precluded from considering any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant may offer as a mitigating factor as to punishment. Writing for the plurality, Chief Justice Burger concluded that "the Eighth and Fourteenth Amendments re-

quire that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in the original). Recognizing "that the imposition of death by public authority is ... profoundly different from all other penalties," the plurality held that the ·sentencing authority must be free to give "independent mitigating weight to aspects of the defendant's character and record and to [the] circumstances of the offense proffered in mitigation." *Id.* Because the Ohio death penalty statute only permitted consideration of three mitigating circumstances, the Court found the statute to be invalid. *Lockett* thus underscored *Jurek'*s recognition that the constitutionality of the Texas scheme "turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Jurek,* 428 U.S. at 272, 96 S.Ct. at 2956. See *Lockett,* 438 U.S. at 607, 98 S.Ct. at 2966. See also *Hitchcock v. Dugger,* 481 U.S. 393, 397, 107 S.Ct. 1821, 1823, 95 L.Ed.2d 347 (1987) (advisory jury and sentencing judge could not constitutionally refuse to consider nonstatutory mitigating circumstances); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (State court's exclusion from death penalty sentencing hearing of testimony as to defendant's good behavior in jail held violative of Cruel and Unusual Clause of the Eighth Amendment); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (trial court erred when, in imposing the death penalty as punishment, it refused to consider, "as a matter of law," circumstances of Eddings' upbringing and emotional disturbance).[8]

---

8. In *Eddings,* Justice Powell, writing for the majority of the United States Supreme Court, declared:

"We find that the limitations placed by these courts upon the mitigating evidence they would consider violated the rule in *Lockett.* Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law,* any relevant

mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 113–114, 102

■ Clearly then, for the Texas death penalty statutes to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider and give effect to all relevant mitigating evidence. The State in the case before us impliedly concedes, as it does not contest, the relevant, mitigating aspect of appellant's testimony. See *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr.App.1977); *Cass v. State*, 676 S.W.2d 589 (Tex.Cr.App.1984). The State argues, however, that the trial court properly excluded the evidence and offers several reasons in support of the judge's actions.

The State argues that appellant failed to show sufficient expertise on the part of his witness such that the witness was not qualified to give an expert opinion on the likelihood of future dangerousness. The State

asserts that it objected at trial to the witness's lack of expertise and refers this Court to a certain page in the statement of facts where we are supposed to find this objection. The State's objection is not there and after reviewing and re-reviewing the record we are unable to find any such objection.[9] We must conclude that the State did not object at trial to Harlin's lack of expertise.

■ In order to testify about scientific, technical, or other specialized matter, a witness must be qualified as an expert. The initial burden of establishing a witness's qualifications lies with the party offering the testimony. *Holloway v. State*, 613 S.W.2d 497, 501 (Tex.Cr.App.1981). This was done in this case.[10] If the State believed that Harlin was not qualified as an

---

S.Ct. at 876–77 (footnotes omitted and emphasis in original).

9. In its brief, the State has combined its response to this point of error with that concerning another of appellant's point of error involving the witness, Donn D. Woolery, through whom appellant tried to present similar evidence to the jury. The State writes:

> "In regard to the exclusion of the opinion testimony of ... Harlin and Woolery concerning the probability of the appellant's future violence, the State objected at trial on the basis that the defense witnesses were not sufficiently qualified as experts to state opinions based on hypothetical facts and were not qualified to express lay opinion regarding future dangerousness (S.F. XXXVIII—2837–2850)." State's Brief at p. 49.

This is incorrect. It was to Woolery's proposed testimony, and only to Woolery's proposed testimony, that the State voiced an objection that he was not qualified to give an expert opinion. As to Harlin's testimony, the State's only objection was that the witness's evidence was irrelevant and the trial court, upholding the State's objection, specifically articulated that such was "irrelevant." No explicit finding regarding Harlin's expertise was ever made by the trial court.

10. No rigid formula exists for determining whether a particular witness is qualified to testify as an expert. A witness may be qualified by reason of knowledge, skill, experience, or training, regardless of its source. *Holloway v. State*, 613 S.W.2d 497, 501 (Tex.Cr.App.1981). Harlin testified that he was a member of the National Rehabilitation Society, the International Halfway House Association, the Texas Association of Halfway Houses, the Texas Alliance for the Mentally Ill, the Houston Alliance for Mental

Recovery and founder of the Montgomery County Alliance for Mental Recovery. He had operated a halfway house for the Parole Board and Rehabilitation Commission for three years and had dealt with about three-hundred ex-offenders. During this time he had kept records on the recidivism rates of the clients. At the time of trial, Harlin was the program administrator for the Lynwood Foundation which operated a "residential facility" (halfway house) for the mentally ill. Harlin further testified that, in total, he had been involved in the criminal justice system for about twenty-nine years. His educational experience included attending conferences ("about four or five a year") by the Texas Halfway House Association and attending workshops by the Texas Planning Counsel for Developmental Disabilities. Harlin testified that he attended the University of Oklahoma for courses in management of rehabilitation facilities.

In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court made the following pertinent observations:

> "[U]nder the Texas capital sentencing procedure, the inquiry necessary for the jury's resolution of the future dangerousness issue *is in no sense confined to the province of psychiatric experts.* Indeed, some in the psychiatric community are of the view that clinical predictions as to whether a person would or would not commit violent acts in the future are 'fundamentally of very low reliability' and that psychiatrists possess no special qualifications for making such forecasts." 451 U.S. at 472, 101 S.Ct. at 1878 (emphasis added), citing, inter alia, *Report of the American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual*, 23–36 (1974) and Stone, *Mental Health and Law: A System in Transition*, 27–36 (1975).

expert to give his testimony, then it was incumbent upon the State to demonstrate his incompetency through voir dire and to object. It is a familiar rule of law that the failure to object to a witness's competency to testify operates as a waiver of the witness's qualifications and may not be raised for the first time on appeal. See Ray, *Texas Law of Evidence*, § 255, and cases cited at p. 292 (Texas Practice, 3rd ed. 1980). Because the State did not object (or even request the voir dire of Harlin to test his qualifications as an expert) after appellant initially established his qualifications, we must treat Harlin's testimony as that of a qualified expert.

■ The State also argues that the witness based his opinion on experience in the criminal justice system and probability estimates "in general" rather than on individuals with characteristics and backgrounds similar to those of appellant. The State points out that the witness had no personal knowledge of the appellant and argues that "the only way to make predictions [of future dangerousness] relevant is to be able to substantially match the appellant's background with a corresponding group which served long sentences and had positive outside influence." The State concludes that "the bottom line is that the evidence offered was not individualized so as to be of help in predicting the appellant's future behavior." As we understand the State's argument, the proffered evidence is irrelevant because the witness's testimony was not "individualized" and therefore *Lockett* and *Lockett*'s progeny should not dictate its admission into evidence before the jury. We disagree for the simple reason that the State's argument fails to consider that after appellant's witness explained the data upon which he was basing his testimony he was asked hypothetical questions which included the specific characteristics and background of appellant as developed during the trial of this case.

The use of hypothetical questions has been unqualifiedly accepted by this Court as a proper means of proving (or in this case, disproving) the future dangerousness potential of individual defendants. See,

e.g., *Barefoot v. State*, 596 S.W.2d 875, 887 (Tex.Cr.App.1980) cert. denied, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Mays v. State*, 726 S.W.2d 937, 950 (Tex.Cr. App.1986) cert. denied, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1020 (1988); *Hogue v. State*, 711 S.W.2d 9, 28–29 (Tex.Cr.App.) cert. denied, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986); *Vanderbilt v. State*, 629 S.W.2d 709, 721 (Tex.Cr.App.1981) cert. denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982). See generally AN-NOT., *Modern Status of Rule Regarding Use of Hypothetical Questions in Eliciting Opinion of Expert Witness*, 56 A.L.R.3d 300 (1974 and Supp.1990). It is remarkable that the State's arguments in this case are similar to those made in *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). In that case, however, it was the defendant that made the argument that evidence of future dangerousness was unreliable, and that introducing into evidence the answers to hypothetical questions made by one who had not personally examined the defendant was erroneous. These issues were decided adversely to the defendant in *Barefoot* as we decide the issues adversely to the State in the case today. See *Barefoot v. Estelle*, 463 U.S. at 885, 103 S.Ct. at 3390.

■ Finally, the State argues that appellant failed to present sufficient facts in the hypothetical question for the evidence to have been of use to the jury. Once again, we must disagree. The defense posed a hypothetical based upon what it believed to be the uncontroverted facts of the case; it merely omitted from the hypothetical question those facts which were in dispute. Quite significantly, Barefoot had argued to this Court on direct appeal (and repeated the argument in the Supreme Court) that the hypothetical questions asked of the witnesses in that case were deficient in that they were not sufficiently based on the evidence. This Court rejected that argument, holding: "Although a hypothetical question must be based on the facts of the case, counsel may assume the facts in accordance with his theory of the case. If the opponent desires to secure the expert's opinion upon a different set of

facts he may do so on cross-examination." *Barefoot v. State*, 596 S.W.2d at 888.[11] See also *Nethery v. State*, 692 S.W.2d 686, 701 (Tex.Cr.App.1985) cert. denied, 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986).

The bottom line is that we are in no position to provide different criteria for the use of expert opinion based merely upon which party is calling the expert witness. The Supreme Court has countenanced the use of expert testimony to prove future dangerousness in *Barefoot v. Estelle*, but the Court cautioned: "[w]e are unconvinced ... that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, *particularly when the convicted felon has the opportunity to present his own side of the case.*" *Barefoot v. Estelle*, 463 U.S. at 901, 103 S.Ct. at 3399 (emphasis added). In the case before us, upholding the trial court's ruling that appellant's evidence of future dangerousness was "irrelevant" would be tantamount to preventing appellant from presenting his own side of the case. We decline to do this. See *Robinson*, 548 S.W.2d at 65–66 ("To allow only the State to present such evidence [of future dangerousness] would deny the defendant his right under Article 37.071, [V.A.C.C.P.], and the Constitution of the United States as construed by the Supreme Court in the *Jurek* case."); *Cass*, 676 S.W.2d at 592.

It may be argued that the precise points of error addressed in the *Barefoot* case are not presented here (and therefore not controlled by that case) since *Barefoot* dealt with the use of psychiatric testimony whereas today we are concerned with an operator of Texas halfway houses. It is emphasized, however, that in its final analysis, the Court ruled upon the use of "expert witnesses" not just the use of psychiatric testimony:

"Whatever the decision may be about the use of psychiatric testimony, in general, on the issue of future dangerousness,

petitioner urges that such testimony must be based on personal examination and may not be given in response to hypothetical questions. We disagree. Expert testimony, whether in the form of an opinion based on hypothetical questions or otherwise, is commonly admitted as evidence where it might help the factfinder do its assigned job.

\*     \*     \*     \*     \*     \*

"Today, in the federal system, Federal Rules of Evidence 702–706 provide for the testimony of experts. The Advisory Committee Notes touch on the particular objections to hypothetical questions, but none of these caveats lends any support to petitioner's constitutional arguments. Furthermore, the Texas Court of Criminal Appeals could find no fault with the mode of examining the two psychiatrists under Texas law:

" 'The trial court did not err by permitting the doctors to testify on the basis of the hypothetical question. The use of hypothetical questions in the examination of expert witnesses is a well-established practice. 2 C. McCormick and R. Ray, Texas Evidence, § 1402 (2d ed.1956). That the experts had not examined appellant went to the weight of their testimony, not to its admissibility.' 596 S.W.2d at 887.

"Like the Court of Criminal Appeals and the District Court, and the Court of Appeals, we reject petitioner's constitutional arguments against the use of hypothetical questions. *Although cases such as this involve the death penalty, we perceive no constitutional barrier to applying the ordinary rules of evidence governing the use of expert testimony.*" 463 U.S. at 903, 103 S.Ct. at 3400 (emphasis added).

As discussed above, we are resolving the issues in this case as we would in any other case dealing with expert witness testimony. Consequently, we find that the trial court

---

11. The Supreme Court concurred with this holding, writing: "These claims of misuse of the hypothetical questions, as well as others, were rejected by the Texas courts, and neither the District Court nor the Court of Appeals found

any constitutional infirmity in the application of the Texas Rules of Evidence in this particular case. We agree." *Barefoot v. Estelle*, 463 U.S. at 905, 103 S.Ct. at 3401.

abused its discretion when it refused to allow the jury to hear the evidence set out above.

■ The State, in a supplemental brief, has argued that the error was harmless. We hold that the error in this case was not harmless beyond a reasonable doubt. We simply note that the evidence appellant wanted the jury to hear was not introduced in any other fashion before the jury. See *Hitchcock v. Dugger*, 481 U.S. at 399, 107 S.Ct. at 1824 ("In the absence of [a showing that the error] is harmless our cases hold that the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid.")

Accordingly, the judgment and sentence of the trial court are reversed and the cause remanded to the trial court.

CLINTON, BAIRD and OVERSTREET, JJ., concur in the result.