COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS




THADIUS RODRAKUS PINA,

                            Appellant,

v.


THE STATE OF TEXAS,

                            Appellee.

§
 
§
 
§
 
§
 
§
 
 § 


No. 08-05-00103-CR

Appeal from the

409th District Court

of El Paso County, Texas 

(TC# 20030D04706) 




O P I N I O N
 
            Thadius Rodrakus Pina appeals his conviction for injury to a child. A jury found him
guilty of the offense and assessed punishment at twenty years’ imprisonment. In two issues,
Appellant challenges the legal and factual sufficiency of the evidence to support a finding that he
intentionally and knowingly by omission caused serious bodily injury to B.P. We affirm.
            On January 13, 2002, around 11:30 a.m., Daniel Medrano of the El Paso Fire Department
was dispatched to Appellant’s residence at 4853 Maureen Circle in response to a dead-on-the-scene call. Upon arrival, Medrano entered the house and found seventeen-month old B.P. lying
on the floor face-up. Appellant, the father, was sitting on a chair and the mother, Jasmine Pina,
was sitting on the couch. Both parents were staring at their child. Appellant appeared to be in
shock. Medrano tried to ascertain information from the couple concerning the child’s medical
history or any illnesses she might have had. Mrs. Pina told Medrano that B.P. seemed to have
had a cold, so she gave her children’s Tylenol the previous evening. She last saw B.P. alive
around midnight. Mrs. Pina told Medrano that sometime between 10 a.m. and 10:30 a.m. she
went to wake up the baby and found her dead. With regard to the lapse of time before the
emergency call, Medrano later found out that Mrs. Pina initially called her husband at work.
            Officer Michael Velez responded to the scene as a crime scene unit officer. Officer Velez
photographed the interior of Appellant’s residence. The officer found the child’s carrier heavily
stained. The refrigerator contained some food and milk. Children’s toys were on the floor in a
bedroom that contained two cribs and the child carrier. The officer also observed plates with
food residue, diapers, a baby bath and shampoo, and other baby supplies. Officer Robert Posada
canvassed the neighborhood around the residence. Specifically, Officer Posada canvassed the
eight to ten houses around Appellant’s house. None of the individuals who he canvassed had
ever seen Appellant’s children playing outside. However, Appellant and his family had only
been living there for about six or seven months.
            Dr. Corinne Stern, Chief Medical Examiner for El Paso County, was also dispatched to
Appellant’s residence. When she walked into the residence, Dr. Stern observed a very small
child lying on the carpeted floor face-up. Based on her initial observation, she thought law
enforcement had the wrong age because the child looked like an infant. Dr. Stern verified the
child’s age in her conversation with Appellant about B.P.’s medical history. Appellant told Dr.
Stern that B.P. had been suffering from cold-like symptoms for the past few days. Dr. Stern also
learned that B.P. had not been taken to the doctor in over a year and that B.P. had not had any
immunizations. Dr. Stern then observed B.P.’s body at the scene. She first noticed that B.P. had
been dressed warmly. Dr. Stern next determined that B.P. was in full rigor mortis. Dr. Stern
checked B.P.’s lividity and found that her skin did not blanch when touched, but rather was
fixed. She estimated that B.P. had been dead between eight to twelve hours.
            Dr. Stern performed the autopsy on B.P. and prepared the autopsy report, which reflected
her findings and opinion. In her external examination of the body, Dr. Stern observed that B.P.’s
abdomen was greatly distended and the muscles in her lower extremities were wasting away. 
B.P. should have had fat pads in the thigh area, but had none. B.P.’s upper extremities were thin
as well. Dr. Stern also noted that B.P. had extremely dry skin, a sign of dehydration. Because of
the dryness and flakiness of B.P.’s skin, Dr. Stern was concerned that B.P. may have suffered
from severe dehydration. She had never seen such dry skin in any of the autopsies she had
performed on a child or infant. Dr. Stern observed that B.P.’s hair was extremely matted and
very dirty; her scalp was also extremely dry. B.P.’s mucous membranes, gums, and the area
underneath her lips were extremely dry. B.P. had natural teeth, but they were brown, rotted, and
mal-developed. Dr. Stern described her teeth’s appearance as “milk bottle” teeth, a condition
that occurs when an infant sleeps with a bottle of milk in his or her mouth. Dr. Stern described
B.P.’s teeth this way, but their condition could have been caused by not receiving adequate
nutrition and calcium for proper tooth development. B.P.’s teeth would have been an easily
observable condition while the child was alive. Dr. Stern observed that B.P.’s fingernails were
extremely long and had a lot of dirt underneath them.
            In her external examination, Dr. Stern also noticed superficial contusions, or bruises, on
B.P.’s forehead. Specifically, B.P. had bruises on the middle and left side of her forehead, her
left temporal scalp, and her right temporal scalp. She also had abrasions above both of her
eyebrows and two bruises lateral to the right side of her lips. It was reported to Dr. Stern that
B.P.’s siblings had hit her on the head with toys, which was consistent with the superficial
injuries. Dr. Stern opined that these bruises were not the cause of death. Dr. Stern also found a
blue-green contusion, measuring one by one-half inch, on the right side of the abdomen. B.P.
also had multiple excoriations, or scratches, on the left and right sides of her torso, which Dr.
Stern believed were self-inflicted because B.P.’s skin was so dry and irritated.
            Dr. Stern testified that during the internal examination of the body, she found no recent or
healed fractures and B.P.’s spinal fluid was clear, which ruled out meningitis as the cause of
death. Blood cultures indicated that no bacteria contributed to B.P.’s death and a forensic screen
of her blood tested negative for over-the-counter prescriptions or illegal drugs.


 Dr. Stern
measured the fat pad of the abdomen under the umbilicus. The area measured one millimeter, in
other words, B.P. had virtually no fat on her body. According to Dr. Stern, a seventeen-month
old child should have a fat pad of at least a quarter of an inch. B.P. had little to no fat inside her
body cavities, that is, none around her kidneys, other organs, or her intestines. Although B.P.’s
organs were normal and proportionate to each other, they were not proportionate for a child of
similar age; rather, they were very small weight-wise.


 B.P. weighed thirteen pounds at the time
of her death, which was very abnormal, putting her in the less than fifth percentile for a child of
her age. At seventeen months old, B.P. was between the size of a three- to six-month old based
on her height and weight.
            Dr. Stern extracted the urine from B.P.’s bladder. B.P. had only one milliliter of urine
and it was very concentrated, very cloudy, and very dark. In B.P.’s stomach, Dr. Stern found 15
milliliters of partially-digested green beans and some meat. However, no feces was found in the
intestines, indicating that she had not developed feces or a stool over a period of days, and
therefore, had not had enough nourishment. Nothing in the internal examination of B.P.’s organs
and muscles showed that she was incapable of taking in food or sustaining nourishment. Further,
Dr. Stern found no evidence of any disease process that would account for the cause of death.
            Based on her external and internal examination of B.P.’s body, Dr. Stern concluded that
B.P. died from severe dehydration due to malnutrition. Dr. Stern testified that several tests
confirmed her finding. A vitreous electrolyte test, which tests the fluid behind the eye, confirmed
that B.P. was severely dehydrated. B.P.’s blood urea nitrogen (“BUN”) level was 36, but it
should not have been over 18, thus indicating severe dehydration. Her sodium level was 148 and
not within the normal range between 136 and 144--another indicator that she was severely
dehydrated. Likewise, B.P.’s chloride level was 129, which was well above 114, the upper limit
of normal. In addition to being severely dehydrated, B.P. was severely malnourished. According
to Dr. Stern, malnourishment happens over a period of months and months. Dr. Stern concluded
that the manner of B.P.’s death was homicide.
            On cross-examination, Dr. Stern testified that B.P. was not suffering from renal tubular
acidosis (“RTA”) because there would have been noticeable changes in the tissue at the
microscopic level and in the electrolytes of the body. Dr. Stern explained that RTA is a
mechanism of a disease that can be a result of severe dehydration; it is not a disease itself. In
other words, it does not cause the dehydration, rather the dehydration causes it. Dr. Stern
conceded that B.P. could have developed the condition, but she did not see it in the microscopic
examination. Regardless, even if B.P. did have it, the cause would have been the severe
dehydration because she was malnourished. Dr. Stern maintained that B.P. starved to death. 
            Jason Christensen, Appellant’s ex-brother-in-law, was familiar with three of Appellant’s
four children, T.P., age seven-and-a-half, J.P., age five-and-a-half, and B.P., now deceased. Mr.
Christensen first met B.P. when she was about three months old. B.P. seemed small, very quiet
for her age, and did not act like other children. He recalled that she just sat in her carrier all day,
not crying, laughing, or making any facial expressions. She just sat still and emotionless. Mr.
Christensen noticed that Appellant was very cold to his daughter. Appellant would pick up B.P.,
hold her and then put her back down or hold the bottle for her, but Mr. Christensen saw no
nurturing or loving interaction between Appellant and B.P. Mr. Christensen stated that he
witnessed Appellant controlling how much his children ate during their meals together. He
recalled that Appellant would decide how much the children could eat and if they were eating too
much of a certain portion, he would instruct them to stop eating that item. According to Mr.
Christensen, the children were afraid to eat and acted scared all the time. They appeared very
skinny and very inactive for their ages. He believed they were often hungry because when they
did eat, they would eat really fast, sometimes putting food in both hands.
            Mr. Christensen also noticed that when the children would visit, they would just sit still
on the couch and were not allowed to get up and play. He described them as “little statues, little
robots.” When Appellant would punish one of the children, he would yell at the child using
profanity and make the child stand in the corner for long periods of time with her face against the
wall. Mr. Christensen recalled that T.P. would only talk in a whisper. On one occasion, T.P.
stayed with his family in California and Mr. Christensen noticed that T.P. acted extremely
different. At first, T.P. was really quiet and reserved. She would stuff her food down when she
ate and would keep eating as if she had not eaten in a week. Mr. Christensen recalled that T.P.’s
mouth would be full and she would be trying to take another bite. After a few weeks or months,
however, T.P. became more open and vocal, relaxed, and playful once she became accustomed to
having other children to play with and to having regular meals. At one point, Mr. Christensen
and his ex-wife had considered calling Child Protective Services anonymously because of the
children’s eating behavior and their condition. On cross-examination, Mr. Christensen admitted
that he never visited Appellant’s house while B.P. was alive and never saw what kind of food
was in the residence.
            Ticha Warner operated a home daycare business and took care of Appellant’s children in
2000 and 2001. Ms. Warner testified that Appellant and his wife provided her with baby food,
formula, diapers, and a change of clothes for the children. When Ms. Warner first started taking
care of the two older children, T.P. was pretty healthy, but small and short for her age. J.P. was
very small and tiny, but starting gaining weight after she took care of her for awhile. As for their
eating habits, Ms. Warner noticed that they ate a lot compared to the other children in her care. 
Appellant and Mrs. Pina made it clear to her that the children were not to eat too much.
            With regard to B.P., Ms. Warner testified that she began taking care of B.P. when she was
about six-weeks old. B.P. was noticeably small, but not too small. Ms. Warner stated that B.P.
never smiled, never moved around, and never played with toys like other infants or children her
age. When B.P. was about six months old, she started eating baby food. During her first six
months, Ms. Warner was not concerned about B.P.’s health, besides noticing that she was small. 
However, when B.P. was seven or eight months old, Ms. Warner became concerned about her
eating habits. Ms. Warner mentioned her concern to Appellant and his wife and advised them
that B.P. was very small and needed to eat a lot more, perhaps some cereal or solid foods. They
continued to provide baby food, but nevertheless Ms. Warner fed B.P. solid food. She recalled
that B.P. would eat up everything she would give her without problems. Ms. Warner stopped
taking care of B.P. in September or October of 2001.
            In December 2001, just before B.P. died, Ms. Warner saw B.P. and noticed that she was a
little heavier, but still tiny. When Ms. Warner expressed concern, Appellant responded that B.P.
was eating well and seemed fine at home. Ms. Warner suggested that he take B.P. to the doctor,
but Appellant told her she had already seen the pediatrician and he had said she was fine. At one
point, Ms. Warner had considered notifying the authorities because she was concerned about
B.P.’s weight. However, when she told Appellant and his wife that B.P. needed to eat more and
gain more weight, they seemed to understand her concern, seemed genuinely concerned
themselves, and she thought they were going to do something about it. After seeing B.P. again
just before she died, Ms. Warner realized they were not taking care of the problem.
            Martha Ballesteros, a social worker for Child Protective Services, began an investigation
of the Pina family after the agency received a report about B.P.’s death. Ms. Ballesteros spoke
with Appellant and his wife when she went to their home. Ms. Ballesteros was unable to
determine when B.P. or her siblings had last seen a doctor. According to Ms. Ballesteros, the
Family Code requires parents to provide care, protection, control, food, and nourishment to their
children; if that does not happen, Child Protective Services removes the children from the home.
            During the course of the police investigation into B.P.’s death, Detective Gonzalo
Chavarria interviewed Appellant and took his written statement. In pertinent part, Appellant
gave the following statement on January 13:
My name is Thadius Pina . . . [and I am] giving this statement voluntarily to
Detective Chavarria. This statement is in reference to the death of my baby girl
[B.P.] 
 
[B.P.] was born on 08-02-00. She was born a couple of weeks early and weighed
at about six lbs. Just like her sisters. The baby was healthy and she has not been
sick but for a common cold especially when she was teething. All the girls have
the same pediatrician but I don’t recall his name at this time as our insurance just
changed in December. Prior to that the children went to see other doctors for
immunizations and such. My wife knows the names as she was the one who
usually took the girls. [B.P.] last went to the doctor in the middle of last year for
immunizations. The baby [B.P.] was healthy and I only remember she might have
had a runny nose. 
 
I work day shift and my wife works in the evening. We changed our shifts this
way in order that the girls were always with one of us.
 
I worked yesterday (Saturday) from 6:30 AM to 1:30 PM. I made a couple of
stops (gas, bank) and arrived at home at about 2:30 PM. We spent the day at
home watching and playing with toys and videos with the kids. My wife went to
K-mart in the evening to buy a ping-pong table. I later went back to K-mart
because we were missing a part of the table. We fed the kids some green beans
and stuffing. They had turkey and bread. They all ate the same thing and drank
water. I changed [B.P.]’s diaper at about 8:45 PM as I was going to put them to
bed. [T.P.] sleeps by her self in a small bed in her room. The youngest girls share
a room where they each have their own crib. [B.P.] seems to go to sleep faster and
more comfortable in the carrier. The carrier is usually between the two cribs. I
put [B.P.] [i]n the carrier and covered her with a small blanket. I then strapped
her so she wouldn’t fall. [B.P.] is small and is walking some but she supports
herself by grabbing on to things and mostly crawls. She hasn’t developed as fast
as her sisters. I had asked other people who have kids this age and the doctors
about her not developing and everyone told us kids develop at different stages. As
far as I knew my baby was healthy. The baby did not seem uncomfortable and or
sick last night. I believe she went to sleep shortly thereafter. I heard [B.P.]
crying and squirming just before midnight. I went and it is then that I actually
covered her. I wrapped her in her blanket and put her back in the carrier. She did
not complain or anything. I went to sleep jus[t] after midnight. My wife stayed
up a little bit longer. 
 
I woke up at approx. 5:40 AM. I went to check up on the kids and take [J.P.] to
the potty as I usually do. I only turned on the hall light but I could see [B.P.]
asleep in the carrier. This was no different than any other day. I thought my baby
was asleep and so I did not bother her. I took [J.P.] to the restroom and put her
back in the crib. 
 
I left home to work at about 6:10 AM. I was at work when I got a call from my
wife. I guess it was about 10:54 AM. Jasmine was hysterical and told me to
come home now. She told me something was wrong but didn’t tell me what. I
rushed home as I didn’t know what was going on. When I got home I found that
Jasmine had found [B.P.] dead in her carrier. Jasmine was crying and sobbing by
the sofa and I took [B.P.] from the carrier. I tried giving her CPR and felt that she
was cold. I called 911 and told them that [B.P.] was dead. I carried [B.P.] into
the living room and I couldn’t believe my baby was dead. She was stiff but I tried
CPR again until the Fire and EMS arrived. Police later arrived as well as the
Medical examiners and other investigators.
 
We waited until the baby was removed. I was asked to come to the Police office
to give this statement. I don’t know what happened to [B.P.]. I have no idea what
caused [her] death. 

            In his defense, Appellant called two witnesses, Yolanda Chacon and Dr. Harry Wilson. 
Yolanda Chacon used to take care of Appellant’s children, first in a daycare center and later in
her home until August 2001. Ms. Chacon provided food for the children, but Appellant and his
wife would provide diapers, wipes, and “Gerbers.” Ms. Chacon stated that the Pinas were the
same as the parents of other children in her care and she considered them responsible. For
instance, the girls were clean and when they were getting a cold, the Pinas would bring Tylenol
for them and give her their phone numbers in case of an emergency. She recalled that the girls
would eat a lot and would never stop eating as if they were never full and were always hungry. 
Ms. Chacon recalled that B.P. was little. B.P. was delayed in walking. Ms. Chacon was not
concerned about B.P.’s late development because B.P. was talking and laughing and would walk
if held by the hand.
            Dr. Harry Wilson, a pediatric pathologist, reviewed the autopsy report prepared by Dr.
Stern, Appellant’s statement, B.P.’s birth record, the autopsy protocol, x-rays and glass slides
from the autopsy, and other information about statements made around the life and death of B.P. 
Dr. Wilson disagreed with Dr. Stern’s conclusion as to the cause and manner of death. He
agreed that B.P. was dehydrated at the time of her death, but he believed the cause of death was a
metabolic cause related to an electrolyte disturbance with terminal heart failure. Based on the
information he reviewed, Dr. Wilson would have classified B.P.’s death as either natural or
undetermined, due to the findings of unexplained trauma, i.e., the fresh bruises and abrasions
over her scalp and face.
            Dr. Wilson testified that B.P. was not malnourished in the sense of lacking access to
adequate food substances because unlike typical cases of malnutrition, B.P. did not have excess
fluid in her belly, did not have an enlarged liver, did not have skin sores or non-healing wounds
and did not show any signs of infection or hair loss at the time of her death. In addition, there
was no evidence of any specific vitamin deficiencies, such as vitamins D or K, which cause
rickets and excessive bleeding, respectively. Dr. Wilson noted that B.P. was extraordinarily
small for her age. She was the appropriate size and weight at birth, therefore something
happened to cause her not to thrive. The doctor noted that all of B.P.’s organs were appropriately
grown and appropriately structured for her small size, except her kidneys. They were at the
three-month old size instead of the six-month size like the rest of her organs, with the exception
of her brain, which was actually more appropriate for her chronologic age.
            Based on his findings, Dr. Wilson believed that B.P. died from RTA Type 1, a well-recognized, but uncommon genetic disease. Contrary to Dr. Stern’s opinion, Dr. Wilson stated
that RTA is a disease, not a mechanism effect of dehydration, although dehydration can cause
acidosis and other problems. Dr. Wilson explained that RTA occurs when the kidneys lose the
ability to excrete acids into the urine, causing acid to accumulate in the blood and leading to
chronic electrolyte disturbances from the chronic acidosis. RTA presents itself in girls at age six
months to two years, which was consistent with the time that B.P. stopped growing. Those
suffering from RTA have a very specific set of symptoms: they tend to be quiet and less active;
they breathe fast; their kidneys cannot concentrate urine so they actually lose water and are very
prone to dehydration; they accumulate acid; their organs do not grow; and they stay small in size
and do not thrive. The doctor explained that children with RTA do not eat very much because
their system has slowed down. The autopsy findings showed that B.P.’s bones formed normally,
but were demineralized, meaning the calcium originally found there had leached out and had
passed out in the urine. B.P. also had little micro calcifications within her kidneys. According to
Dr. Wilson, the most important features of RTA are bone demineralization and small kidneys
with small micro calcifications in the tubules of the kidneys. Based on the micro calcifications,
small kidney size, demineralized bones, and an abnormally low calcium level at autopsy, Dr.
Wilson opined that B.P. suffered from a metabolic disturbance related to an unsuspected renal
disease which caused her not to grow. Moreover, B.P.’s heart had normal weight in proportion
to her body size, but her heart shadow was increased, which indicated to Dr. Wilson that she died
in a state of cardiac dilatation probably due to an electrolyte disturbance and a lethal arrhythmia.
            Dr. Wilson felt strongly that B.P. should have been taken to a physician because she was
not growing. Although RTA is a subtle disease and hard to diagnosis, it can be diagnosed from
samples of blood and urine. If she had been given the opportunity to be diagnosed, the disease
could have been easily treated with sodium bicarbonate. Dr. Wilson believed that a parent who
has raised other children has an expectation of growth for a child. That expectation of growth
was not being met by B.P. Since B.P. only grew to a six-month size, that indicated there was
something terribly wrong with her.
            On cross-examination, Dr. Wilson agreed with Dr. Stern’s observation of dehydration,
but would have classified it as mild to moderate, instead of severe. Instead of finding
malnutrition, Dr. Wilson would have characterized it as severe failure to thrive on the basis of a
suspected metabolic disorder. Dr. Wilson would not have concluded that the manner of death
was homicide. Based on the available information, Dr. Wilson believed B.P.’s manner of death
was natural, but he was concerned about the issues of medical neglect and the unexplained
findings of trauma. Dr. Wilson conceded that by definition, death of a child due to medical
neglect would be a homicide. He admitted that under his definition, the circumstances of this
case would be considered a homicide because of medical neglect, but not because of starvation.
            Dr. Wilson admitted that a child needs to be alive in order to properly diagnose RTA. 
However, he maintained there was evidence of a suspected underlying disease and even though
no definitive clinical tests could be done, his suspicion level of this diagnosis was high. Dr.
Wilson also conceded that B.P.’s symptoms, namely her small stature, tiny organs, dehydration,
thin bones, and weight at death, were also consistent with a child who has starved to death. The
symptoms of illnesses for RTA, however, included lack of growth, shortness of breath, quietness,
and lethargy. A parent would have to make an active decision to have the child evaluated rather
than to keep ignoring the problem. Regardless, Dr. Wilson agreed that in a case such as this
where the child is of drastic small stature for her age, any parent would have recognized that the
child was in a potentially life-threatening situation and that from a medical point of view, failure
to do so is homicide.
            In rebuttal, Dr. Stern testified that she was aware of the rare genetic disease RTA Type 1
about which Dr. Wilson had testified. She reiterated that B.P. did not suffer from RTA.


 Dr.
Stern noted that analysis of B.P.’s vitreous electrolytes showed that B.P.’s BUN level was at 36,
whereas the upper limits of normal is 18. In RTA, the BUN level does not rise but stays normal. 
B.P.’s BUN level was greatly elevated because she suffered from dehydration, not from RTA. 
According to Dr. Stern, B.P.’s low calcium level was a sign of malnutrition. As for the bone
demineralization, Dr. Stern stated that this is expected in someone who has had chronic calcium
deficiency. Dr. Stern also disagreed with Dr. Wilson’s opinion about B.P.’s heart. In the
autopsy, Dr. Stern actually held B.P.’s heart and found it was not enlarged and observed no
dilatation--it was perfectly normal. Finally, contrary to Dr. Wilson’s conclusion, Dr. Stern stated
that B.P.’s kidneys were absolutely not small for her size.SUFFICIENCY OF THE EVIDENCEIn two issues, Appellant contends the evidence is both legally and factually insufficient to
sustain his conviction for injury to a child. 
            In reviewing the legal sufficiency of the evidence, we must view the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hernandez v. State, 946 S.W.2d 108, 110-11 (Tex.App.--El Paso 1997, no pet.). We do not resolve any conflict of fact, weigh any
evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. 
See Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d
839, 843 (Tex.Crim.App. 1991). Instead, our duty is to determine whether if both the explicit
and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial
in the light most favorable to the verdict. See Adelman, 828 S.W.2d at 421-22. In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict. Matson, 819 S.W.2d at 843.
Further, the standard of review is the same for both direct and circumstantial evidence cases.
Earhart v. State, 823 S.W.2d 607, 616 (Tex.Crim.App. 1991); Geesa v. State, 820 S.W.2d 154,
158 (Tex.Crim.App.1991), overruled on other grounds, Paulson v. State, 28 S.W.3d 570
(Tex.Crim.App. 2000).
            In reviewing the factual sufficiency of the evidence, we must determine whether
considering all the evidence in a neutral light, the jury was rationally justified in finding guilt
beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004),
overruled on other grounds by Watson v. State, -- S.W.3d --, 2006 WL 2956272 (Tex.Crim.App.
Oct. 18, 2006). Evidence can be factually insufficient if the evidence supporting the verdict,
considered by itself, is too weak to support the finding of guilt beyond a reasonable doubt, or
contrary evidence is so strong that guilt cannot be proven beyond a reasonable doubt. Id. at 484-85. Our evaluation, however, should not intrude upon the fact finder’s role as the sole judge of
the weight and credibility given to any witness’s testimony. See Cain v. State, 958 S.W.2d 404,
407 (Tex.Crim.App. 1997). We will not set aside the judgment unless the evidence supporting
the verdict is so weak as to be clearly wrong and manifestly unjust. Zuniga, 144 S.W.3d at 481.
A clearly wrong and manifestly unjust verdict occurs where the jury’s finding “shocks the
conscience” or “clearly demonstrates bias.” Id. An opinion addressing factual sufficiency must
include a discussion of the most important and relevant evidence that supports the appellant’s
complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).
Injury to a Child
            A person commits the offense of injury to a child if he intentionally or knowingly, either
by act or omission, causes serious bodily injury to a child. See Tex.Pen.Code Ann. §
22.04(a)(1) (Vernon Supp. 2006). Here, the State was required to prove that Appellant
intentionally or knowingly committed the offense of injury to a child by: (1) failing to provide
B.P. with adequate nourishment or (2) failing to provide care, protection, and control for B.P.


 A
person acts intentionally when it is his conscious objective or desire to engage in the conduct or
cause the result. See Tex.Pen.Code Ann. § 6.03(a) (Vernon 2003). A person acts knowingly
with respect to a result of his conduct when he is aware that his conduct is reasonably certain to
cause the result. Id. § 6.03(b). “Serious bodily injury” means bodily injury that creates a
substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss
or impairment of the function of any bodily member or organ. Tex.Pen.Code Ann. §
1.07(a)(46). Intent or knowledge may be inferred from the acts, words, and conduct of the
accused. See Hart v. State, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002); Manrique v. State, 994
S.W.2d 640, 649 (Tex.Crim.App. 1999).
            Viewing the evidence in the light most favorable to the verdict, the evidence shows that
seventeen-month old B.P. had not been taken to a doctor in over a year. Although Appellant told
Dr. Stern that B.P. had been suffering from cold-like symptoms, the microscopic examination at
autopsy showed no evidence of infection. Dr. Stern observed various visible signs of
malnutrition and dehydration in B.P., including a distended abdomen, wasting away of muscles
in the lower extremities, extremely dry skin, and rotted and mal-developed teeth. B.P. had
virtually no fat on her body and while B.P.’s organs were normal and proportional to each other,
they were not proportionate for a child of similar chronologic age. For a seventeen-month old,
B.P.’s weight of thirteen pounds was very abnormal. It was apparent that B.P. was malnourished
over a long period of time and tragically just stopped growing, remaining at the size of a three- to
six-month old. While some food was found in B.P.’s stomach, no feces was found in her
intestines, which indicated that she had not had enough nourishment to develop feces or a stool
over a period of days. Dr. Stern found no evidence of any disease process or incapacity to take in
food or sustain nourishment that would account for the cause of death. Dr. Stern concluded that
B.P. died from severe dehydration due to malnutrition and the manner of death was homicide. 
Contrary to Dr. Wilson’s opinion, Dr. Stern did not believe that B.P. was suffering from genetic
RTA, maintaining her opinion that B.P. was malnourished and had starved to death. Regardless,
Dr. Wilson agreed that in this case where the child is of drastic small stature for her age, any
parent would have recognized that the child was in a potentially life-threatening situation and
that death due to medical neglect would be homicide.
            Mr. Christensen testified to observing Appellant control how much his children ate,
stating that Appellant would decide how much the children could eat and would instruct them to
stop eating certain portions of their food. According to Mr. Christensen, the children were very
skinny and inactive for their ages. He believed they were often hungry based on their unusual
eating behaviors. Ms. Warner also noticed the children’s eating habits and had observed that
they ate a lot in her care and that B.P., in particular, was noticeably small and needed to eat more
food. Indeed, Ms. Warner communicated her concern to Appellant while B.P. was in her care. 
Just before B.P. died, Ms. Warner saw B.P. and again expressed her concern, suggesting to
Appellant that he take B.P. to the doctor. Appellant told Ms. Warner that B.P. had already seen
the pediatrician and he had said she was fine. During the conversation, Ms. Warner thought
Appellant seemed to understand her concern about B.P. needing to eat more and gain more
weight.
            Based on the evidence above, the jury could have reasonably inferred that Appellant
intentionally or knowingly caused serious bodily injury to B.P. by failing to provide her with
adequate nourishment, care, protection, and control. Witnesses observed Appellant control and
limit B.P.’s food intake, B.P.’s subsequent and very obvious failure to grow, and her ultimate
decline in health. Moreover, Ms. Warner told Appellant that B.P. was too skinny, that she
needed to eat more food, and needed to see a doctor, but he apparently took no action. Dr. Stern
testified that B.P. was malnourished over a long period of time. Dr. Stern also testified that
severe dehydration due to malnutrition was B.P.’s cause of death. The jury could have
reasonably inferred that it was Appellant’s conscious objective or desire to cause serious bodily
injury to B.P. or that he was aware that his conduct was reasonably certain to cause serious
bodily injury.
            Pointing to his written statement to police, Appellant argues that aside from having a
cold, he believed that B.P. was healthy, that he did not know what happened to B.P., and had no
idea what caused her death. However, the jury, as the trier of fact and sole judge of the
credibility of the witnesses was free to accept or reject all or part of Appellant’s testimony. See
Jones v. State, 944 S.W.2d 642, 647 (Tex.Crim.App. 1996). After reviewing all the evidence in
a neutral light, we conclude the evidence was not too weak to support the guilty finding beyond a
reasonable doubt nor is the contrary evidence strong enough that the beyond-a-reasonable-doubt
standard was not met. Therefore, we conclude the evidence is both legally and factually
sufficient to sustain Appellant’s conviction. Issues One and Two are overruled. We affirm the
trial court’s judgment.
 
                                                                        DAVID WELLINGTON CHEW, Chief Justice

November 16, 2006

Before Chew, C.J., McClure, J., and Barajas, C.J. (Ret.)
Barajas, C.J. (Ret.), sitting by assignment, not participating

(Do Not Publish)