IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-07-00102-CR

 

Henry Marsh Diggs,

                                                                                    Appellant

 v.

 

The State of Texas,

                                                                                    Appellee

 

 

 



From the 66th District Court

Hill County, Texas

Trial Court No. 34,611

 



MEMORANDUM  Opinion



 








            A jury convicted Henry Marsh Diggs of
escape from custody and sentenced him to seventeen years in prison.  On appeal,
Diggs contends that: (1) the evidence is legally insufficient to support his
conviction; (2) the trial court gave defense counsel an unreasonable amount of
time to review the jury charge and submit objections; (3) the trial court
instructed the jury on the wrong definition of “custody”; (4) the trial court
authorized the jury to convict him on a theory not supported by the evidence;
and (5) the trial court allowed a witness to testify to legal conclusions.  We reverse
and render.

FACTUAL BACKGROUND

Pam Wardlow, substance abuse caseload assistant
for the Hill County Community Supervision and Corrections Department,
discovered an active warrant for Diggs’ arrest.  Wardlow contacted the
sheriff’s office when Diggs reported for his next urinalysis.  Deputy Geoffrey
Couldron arrived to arrest Diggs, and Wardlow led him to a room to wait for
Diggs.  When Diggs entered the room, Wardlow remained in the doorway with her
left arm on the door facing.

Couldron informed Diggs that he had a warrant for
his arrest and that he was under arrest and being taken into custody.  In
response to Diggs’s inquiry, Couldron informed him that the warrant was for
unlawful possession of a firearm by a felon.  Couldron instructed Diggs to turn
around and place his hands on the wall.  Diggs placed his hands in his pockets
and mentioned giving his money to a friend.  Couldron told him that he would
have to do that later.

Couldron grabbed Diggs’s arm and turned him to
face the wall.  Diggs turned back around and placed his hands in his pockets.
Couldron again grabbed Diggs’s arm and turned him to face the wall.  Diggs
began to lower his arms, but according to Couldron, “finally submitted and left
his arms on the wall.”  When Couldron bent down to place Diggs in leg
restraints, Diggs pushed away from the wall, knocking Couldron backwards, and
ran towards the door.

Diggs ran towards Wardlow and shoved her shoulder
with his hand.  Wardlow tried to push Diggs away with a soft drink mug that she
had in her hand.  Diggs then shoved Wardlow with both hands, causing her to
fall against some file cabinets and knocking the cabinets out of place. 
Wardlow and Couldron were unable to apprehend Diggs.  He was apprehended the next
day and subsequently charged with escape.

Couldron testified that when he “tell[s] somebody
that they’re under arrest, I put my hands on them, face them against the wall,
they are in custody.”  He felt that Diggs was in custody at the point where he
had told Diggs that he was under arrest and in custody and Diggs placed his
hands on the wall.  Couldron was unable to use the restraints because he first
had to keep Diggs’ hands on the wall, but once this was accomplished, Diggs
ran.  According to Couldron, Diggs’s hands were on the wall for a couple of
seconds, and Diggs’s “submission” to Couldron’s authority lasted a couple of
minutes.  He believed that Diggs had escaped, not evaded arrest, because, at the
time Diggs ran, his movement had been restrained and he had submitted to
Couldron’s authority.

LEGAL SUFFICIENCY

            In his first point of error, Diggs
contends that the evidence is legally insufficient to support his conviction.

Standard of Review

Under legal sufficiency review, we determine whether, after viewing
all the evidence in the light most favorable to the verdict, any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Curry
v. State, 30
S.W.3d 394, 406 (Tex. Crim. App. 2000) (citing Jackson
v. Virginia, 443
U.S. 307, 318-19, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). 
We do not resolve any conflict of fact or assign credibility to the witnesses,
as this was the function of the trier of fact.  See Dewberry
v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999); see also Adelman
v. State, 828
S.W.2d 418, 421 (Tex. Crim. App. 1992); Matson
v. State, 819
S.W.2d 839, 843 (Tex. Crim. App. 1991).  Inconsistencies in the
evidence are resolved in favor of the verdict.  Curry, 30 S.W.3d at 406; Matson, 819 S.W.2d at 843.

Analysis

A person commits the offense of escape where he “(1)
escape[s] (2) from custody (3) after having been arrested for, charged with, or
convicted of an offense.”  Medford v. State,
13 S.W.3d 769, 772 (Tex. Crim. App. 2000).  “[M]ere intent [including an officer’s expression of
intent] to make an arrest is insufficient.”  Id.  Neither
does merely telling the “accused that he is under arrest [] complete that
arrest.”  Id.  “[D]etention, custody or control of the accused” is
required.  Id.

In reliance on Medford and Warner v. State, 201 S.W.3d 197 (Tex. App.—Houston [14th] Dist. 2006), aff’d, 2008 Tex. Crim. App. Lexis 822 (Tex. Crim. App.
July 2, 2008), Diggs contends that an arrest was never completed because his liberty of movement was not successfully
restricted or restrained.

In Medford, Officer Beau Price determined
that Medford matched the description of the subject of an arrest warrant and
approached Medford to conduct an investigatory detention.  See Medford,
13 S.W.3d at 771.  Price searched Medford’s pocket and discovered a matchbox containing cocaine.  Id.  He told Medford that he was under arrest, instructed him to place his hands behind his back, and
grabbed Medford’s arm to place him in handcuffs.  Id.  Medford broke
free of Price’s grasp and fled.  Id.  He was later apprehended and
convicted of escape.  Id.  The Court of Criminal Appeals determined that
Medford was not under “arrest” for purposes of the escape statute because an
arrest is complete when (1) “a person’s liberty of movement
is successfully restricted or restrained, whether this is achieved by an
officer’s physical force or the suspect’s submission to the officer’s authority”;
and (2) “‘a reasonable person in the suspect’s position would have understood
the situation to constitute a restraint on freedom of movement of the degree
which the law associates with formal arrest.’”  Id. at 773.

On remand, the Austin Court reversed Medford’s
conviction because: (1) he submitted to Price’s “questioning and frisk,” but not
an arrest; (2) “a reasonable person familiar with the distinction between an
arrest and a temporary investigative detention would not have understood
himself to be restrained to the degree the law associates with a formal
arrest”; (3) although the “stop-and-frisk” was a detention, “a
seizure short of a completed arrest will not support a conviction for escape”;
(4) Price’s “announcement, after he found the cocaine, that Medford was under
arrest did not in itself complete the arrest”; and (5) Price was “unable to
complete the arrest by successfully restricting or restraining Medford’s
liberty of movement before Medford fled.”  Medford v. State, 21 S.W.3d 668, 670 (Tex. App.—Austin 2000, no
pet.).[1]

In Warner, Deputy Justin Royall responded
to a domestic dispute and was informed that a “blue warrant” had been issued
for Warner’s arrest.  See Warner, 201
S.W.3d at 198.  Upon arriving at
the scene, Royall encountered a group of people and asked to speak with
Warner.  Id.  Warner accompanied Royall to the patrol car.  Id.  Royall placed his hands on Warner’s arms, informed him that he was under
arrest, grasped Warner’s wrist with one hand, and reached for his handcuffs
with the other hand.  Id.  Warner then broke free and fled.  Id.  He was later apprehended and convicted of escape.  See id.  Relying on Medford, the Fourteenth Court found the evidence legally insufficient to sustain Warner’s
conviction.  See id. at 200.       

The Court of Criminal Appeals recently affirmed
this holding, noting that:

…escape can occur only after an officer has
successfully restrained or restricted a suspect -- that is, when the officer’s
grasp has amounted to an arrest.  To hold otherwise would ignore the
distinction the legislature has made between the offense of escape and the
offenses of evading arrest (which a person commits when “he intentionally flees
from a person he knows is a peace officer attempting lawfully to arrest or
detain him”) and resisting arrest (which a person commits when he “intentionally
prevents or obstructs a person he knows is a peace officer…from effecting an
arrest, search, or transportation of the actor or another by using force against
the peace officer or another”). 

 

Warner v. State, No. PD-1644-06, 2008 Tex. Crim. App. Lexis 822, at *11-12 (Tex. Crim. App. July 2, 2008).

The
State argues that the totality of the circumstances establish a completed
arrest via (1) brief physical force that occurred when Couldron grabbed Diggs’s
arm and turned him to face the wall; and (2) submission, which occurred when
Diggs kept his hands on the wall.  It further points to the fact that Diggs
fled from a private building where he had been “hemmed in,” as opposed to a
public location.

The Austin Court recently addressed a similar situation. 
In In re B. J. J., No.
03-07-00633-CV, 2008 Tex. App. Lexis
5212 (Tex. App.—Austin July 9, 2008, no pet. h.) (mem. op.), a juvenile probation officer informed Austin Independent
School District Police Officer Malcolm Monroe of a warrant for B.J.J.’s
arrest.  See id. at *1.  Monroe removed B.J.J. from his classroom and
placed him in the hallway.  Id.  Monroe “informed [B.J.J.] that . . .
his probation officer was there to get him, [and] he had a warrant for his
arrest.”  Id. at *1-2.  Monroe “placed one arm on one of [B.J.J.’s]
shoulders and put him up against the wall” and reached for his handcuffs.  Id. at *2.  B.J.J. turned around, punched Monroe, and began running.  See id. 
B.J.J. was adjudicated delinquent on grounds of evading arrest.  See id.
at *1.  On appeal, he argued that the evidence was legally and factually
insufficient to support his conviction because the evidence established that he
committed the offense of escape.  See id. at *3.  The Austin Court rejected this contention:

In this case, Monroe detained B.J.J. by taking him
from his classroom into the hallway and having him stand against the wall. 
Although B.J.J. submitted to this detention, the detention was not a completed
arrest for the purposes of the escape
statute, and a reasonable person in B.J.J.’s position would not have understood
himself to be restrained to the degree the law associates with a formal
arrest.  Further, Monroe’s statement that he had a warrant for B.J.J.’s arrest
did not complete the arrest.  Like the defendants in Medford and Warner,
B.J.J. fled before Monroe could complete the arrest by restraining him to the
degree required for an escape
conviction.  

 

Id. at
*7-8.

 

Similarly, neither Couldon’s act of grabbing
Diggs’s arm and turning him to face the wall nor Diggs’s brief submission to
Couldron’s authority establishes a completed arrest.  See id. at
*7.  That Diggs fled from a private
building does not establish that his liberty of movement was successfully
restricted or restrained.  Id. at *1-2, 7 (juvenile fled from school
hallway).

As in Medford and Warner, Diggs was
merely in the process of being arrested.  Couldron was unable to complete the
arrest by successfully restricting or restraining Diggs’s liberty of movement;
Diggs broke free from Couldron’s grasp and fled before this could be
accomplished.  A reasonable person in
Diggs’s position would not have understood the situation to constitute a
restraint on freedom of movement to such a degree that the law associates with a
formal arrest.  See Medford, 13 S.W.3d at 773; see also B. J. J.,
2008 Tex. App. Lexis 5212, at *7.

Accordingly, the evidence is legally insufficient
to support Diggs’s escape conviction.  We
sustain Diggs’ first point of error and need not consider his remaining points.
 See Tex. R. App. P. 47.1. 
We reverse the judgment and render a judgment of acquittal.

 

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray dissenting with a note)*

Reversed and rendered

Opinion delivered and
filed August 6, 2008

Do not publish

[CR25]

 

*           (“Chief Justice Gray dissents.  A separate opinion
will not issue.  He notes, however, that Diggs submitted to Officer Couldron’s
authority to the extent that Couldron thought it was safe to apply the leg
restraints.  This is what distinguishes this case from Medford and Warner. 
This must be ‘some evidence’ of an arrest.  I would not take this case from the
jury.  I respectfully dissent.”)

 

 









[1]               The Austin Court had previously reversed
 Medford’s conviction on legal sufficiency grounds.  Medford v. State, 990 S.W.2d 799, 806-11 (Tex. App.—Austin 1999), vacated, 13
S.W.3d 769 (Tex. Crim. App. 2000).  As the Austin Court noted on remand, the Court of Criminal Appeals
did not disapprove of the prior opinion, but remanded the case for
consideration of the facts in light of its newly articulated principles.  Medford
v. State, 21 S.W.3d 668, 669-70 (Tex. App.—Austin 2000, no pet.).








 representations that an investment
would produce monetary results, with no apparent financial loss, and would
likely formulate a decision based on these representations.

In light of the evidence
contained in the record,
the court could reasonably conclude that Matis and Sorensen made actionable
material representations of fact to Kosoglow, Golden, and Deming regarding the
terms of the investment.  See
City of Keller, 168 S.W.3d at
827.




Falsity and/or Recklessness

“A statement is not fraudulent unless the speaker knew it
was false when made or the speaker made it recklessly without knowledge of its
truth.” 
Plunkett, 27 S.W.3d at 613 (citing Prudential, 896 S.W.2d at 163).  Representations are also reckless if made without “sufficient
information or basis
to support
them.”  Trenholm, 646 S.W.2d at 933.  “An unqualified statement that a fact
exists, made for the purpose of inducing another to act upon it, implies that the one who
makes it knows it to be true and speaks from such knowledge.”  Baber v. Pioneer Concrete, 919 S.W.2d 664, 667 (Tex.
App.—Fort Worth 1995, writ dism’d).  “If the facts represented do not exist, and the person states of his
own knowledge that they do, and induces another to act upon his statement, the
law imputes to him a fraudulent purpose.”  Id.  Recklessness may be proved by “direct or circumstantial
evidence.”  Plunkett,
27 S.W.3d at 613.  

Although Matis also invested, he
received no returns or refunds.  He testified that he believed the investment
would take place as represented and would not have invested had he known that there
would be no returns or that his money would not be refunded.  He also testified
that, in hindsight, he “probably would have been a little bit more cautious.”  While
Matis’s and Sorensen’s representations were not necessarily made with knowledge
of their falsity, the record does contain evidence that their representations
were at least made recklessly.

According to the record, Matis and Sorensen did not personally guarantee any
money and there were no written guarantees in place at the time the
representations were made.  Matis, Sorensen, and Weaver all testified that
someone named Alice Brooks had verbally indicated that she would guarantee the
money.  At no time were any guarantees placed in writing.  Moreover, wiring money was
not the only prerequisite for receiving returns.  A total amount of money had
to be collected in order for the investment to move forward and produce returns.

The record is unclear as to whether, at the time
the representations were made, Matis and Sorensen were aware that making the
trade and receiving returns was contingent on obtaining all required funding. 
They may also have been unaware that there were no written guarantees or that
any such guarantees were uncertain.  In either case, they apparently left the
impression that they possessed personal knowledge of the details of the
investment and that the facts as represented were true.  See Baber, 919 S.W.2d at 667.  It
appears that Matis and Sorensen possessed insufficient information on which to
base their representations.  See
Trenholm, 646 S.W.2d at 933.  The court could reasonably conclude that they did
not understand the investment’s process and therefore acted recklessly by
misinforming Kosoglow, Golden, and Deming regarding the investment’s terms.  See Plunkett, 27 S.W.3d at 613.

Matis and Sorensen argue that this result
imposes upon them a duty to investigate the investment prior to making any representations. 
They contend that investments “involve a certain degree of risk;” thus, “any
college graduate, such as the Appellees were shown to be, would know this and
should have known that an expected rate of return in excess of 1200 per cent
per year would involve a high degree of risk.”  However, because Matis’s and
Sorensen’s positive representations negated any perceived “degree of risk,” we
cannot say that Kosoglow, Golden, and Deming were in possession of any facts
that would have led them to question the representations made.  Moreover, whether
Matis and Sorensen possessed a duty to investigate is not the proper inquiry.  The
issue is whether a representation is made falsely or recklessly.  See Plunkett, 27 S.W.3d at 613; see also
Prudential, 896 S.W.2d at 163.  The record contains evidence supporting the
court’s finding that Matis’s and Sorensen’s representations were made
recklessly without any knowledge of their truth.  See City of Keller, 168 S.W.3d at 827.

Intent

A representation must be intended to “induce action.”  Plunkett, 27 S.W.3d at 613.  Intent “is determined at the time the
party made the representation” and “may also be inferred from subsequent acts.” 
 Id.  “Intent is a fact question uniquely within the realm of the trier
of fact because it so depends upon the credibility of the witnesses and the
weight to be given to their testimony.”  Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986).

Although the representations
regarding the investment never developed, Matis and Sorensen contend that their
subsequent failure to perform cannot establish intent.  It is correct that “failure
to perform, standing alone, cannot establish fraudulent intent.”  Columbia/HCA Healthcare Corp.
v. Cottey, 72
S.W.3d 735, 745 (Tex. App.—Waco 2002, no pet.) (emphasis added); see Spoljaric, 708 S.W.2d at 435.  However, “slight
circumstantial evidence of fraud, when considered with the breach of a promise
to perform, is sufficient to support a finding of fraudulent intent.”  Cottey, 72 S.W.3d at 745; see Spoljaric, 708 S.W.2d at 435.

Matis and Sorensen also place
some emphasis on the fact that they derived no benefit from the transaction.  They
contend that they “had no control over the investment and had no relationship
with the company or principles theorof.”  However, “‘all who participate are
liable for the fraud, . . . irrespective
of proof that they shared in the profits, for the gravamen of the action is
injury to plaintiff and not
benefit to defendant.’”  Corpus Christi Area Teachers Credit Union v. Hernandez, 814 S.W.2d 195, 198 (Tex.
App.—San Antonio 1991, no writ) (quoting Crisp
v. Southwest Bancshares Leasing Co., 586 S.W.2d 610, 615 (Tex. Civ. App.—Amarillo
1979, writ ref’d n.r.e.)) (emphasis added); see Crawford v. Ancira, No. 04-96-00078-CV, 1997 Tex. App. Lexis 2263, at
*8 (Tex. App.—San Antonio April 30, 1997, no pet.) (not designated for
publication).  A
plaintiff need not prove that the defendant derived a benefit in order to
maintain a fraud claim.  See Crawford, 1997 Tex. App. Lexis 2263, at *8-9.

Given Matis’s involvement in
raising financing to move the investment forward, it is doubtful that he had any other intent but that
Kosoglow, Golden, and Deming invest.  The record is not entirely clear as to
whether Sorensen directly assisted in these efforts, although he testified that
he and Matis had discussed ways to raise funds for certain business ventures. 
Nevertheless, Sorensen at least participated in obtaining Kosoglow, Golden, and
Deming’s investment.  He and Matis told Kosoglow, Golden, and Deming that funds must be
invested by a certain date in order to join the investment.  Sorensen admitted
that this is often a tactic of scams.  When
the investment yielded no returns, Matis and Sorensen did not act expeditiously
to obtain refunds.  It appears they attempted to stall, offering multiple
reasons why the investment yielded no returns and making proposals for
obtaining refunds, none of which ever developed.  Almost in an effort to
persuade Kosoglow, Golden, and Deming to remain in the investment, Matis and
Sorensen continuously asserted that the investment would generate results and
questioned why Kosoglow, Golden, and Deming wanted a refund when the investment
was about to produce.  In light of Matis’s and Sorensen’s prior and subsequent
actions, the record contains evidence of intent.

The trial court could have inferred that Matis’s and
Sorensen’s representations were made with the intent to induce Kosoglow,
Golden, and Deming to invest.  See Spoljaric, 708 S.W.2d at 434; see also Plunkett, 27 S.W.3d at 613; City of Keller, 168 S.W.3d at 827.

Reliance

A plaintiff must “demonstrate that he relied upon the fraudulent
misrepresentation to his detriment.”  Plunkett, 27 S.W.3d at 614; see Ernst & Young, 51 S.W.3d at 577.  Reliance is established by showing that the defendant’s actions and
representations induced the plaintiff “to act or to refrain from action.”  Ernst & Young, 51 S.W.3d at 577.

Prior to investing, Kosoglow, Golden, and Deming
spoke with Weaver.  Matis and Sorensen contend this conversation amounts to
conducting an investigation.  Actual
knowledge of false representations is “inconsistent with the claim that
the allegedly defrauded party has been deceived, and it negatives the essential
element of reliance upon the truth of the representations.”  Koral
Indus. v. Sec.-Connecticut Life Ins. Co., 788 S.W.2d 136, 146 (Tex. App.—Dallas 1990,
writ denied); Mayes
v. Stewart, 11
S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

 It is not the rule that a person injured by
the fraudulent and false
representations of another is held to the exercise of diligence to suspect
and discover the falsity of such statements. In the absence of knowledge to the
contrary, he would have a right to rely and act upon such statements, and
certainly the wrongdoer in such a case cannot be heard to complain that the
other should have disbelieved his solemn statements. 

 

Koral
Indus. v. Sec.-Connecticut Life Ins. Co., 802 S.W.2d 650, 651 (Tex. 1990)[2]
(quoting W.
Cottage Piano & Organ Co. v. Anderson, 101 S.W. 1061, 1064 (Tex. Civ. App.—Fort
Worth 1907, writ denied)).

Assuming without deciding that
this conversation amounts to undertaking an investigation, there is no
indication that Kosoglow, Golden,
and Deming were placed on notice of the falsity of any representations.  See Koral, 788 S.W.2d at 146; see
also Mayes, 11 S.W.3d at 451.  Weaver merely repeated the
information previously conveyed by Matis and Sorensen.  There is no evidence in
the record suggesting that the conversation Kosoglow, Golden, and Deming had
with Weaver gave any indication that Matis’s and Sorensen’s representations
were false.  Absent such actual knowledge, Kosoglow, Golden, and Deming were
entitled to rely on Matis’s and Sorensen’s representations and were not
required to “suspect and discover” any falsities.  Koral, 802 S.W.2d at
651.

Moreover, the record establishes that these
representations caused Kosoglow, Golden, and Deming to invest.  Kosoglow
testified that these representations were important to his decision, he relied
on these representations, and he would not have invested but for these
representations.  Golden also testified to relying on these representations.  Kosoglow, Golden, and Deming
each wired $25,000 to the required location in order to join the project.  It
is doubtful that this decision was in no way influenced by the possibility of
receiving substantial returns and the assurance of obtaining a refund should
the investment fail.  Accordingly, the record contains evidence supporting a
finding of reliance.  See Plunkett, 27 S.W.3d at 614; see also
Ernst & Young, 51 S.W.3d at 577;
City of Keller, 168 S.W.3d at
827.

In summary, there is
evidence in the record whereby the court could reasonably conclude that Matis
and Sorensen committed fraud.  See City of Keller, 168 S.W.3d at 827.  The judgment is not “so contrary to the overwhelming
weight of the evidence that the verdict is clearly wrong and unjust.”  Checker Bag, 27 S.W.3d at 633.  Because
the evidence is legally and factually sufficient to support the trial court’s
findings, we overrule point of error number two.

The
judgment is affirmed.

 

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

(Chief
Justice Gray concurring)

Affirmed 

Opinion delivered and
filed May 16, 2007

[CV06]









[1]           The court sustained Matis’s and
Sorensen’s objection to Kosoglow’s testimony regarding whether Golden and
Deming relied on Matis’s and Sorensen’s representations.





[2]           This is the Supreme Court’s per
curiam opinion denying writ in Koral
Indus. v. Security-Connecticut Life Ins. Co., 788 S.W.2d 136, 146 (Tex. App.—Dallas 1990,
writ denied).