

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00280-CR

JUAN OLMOS                                                          APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1361532R

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant Juan Olmos was charged, convicted and sentenced to life in prison for aggravated sexual assault.  In a single point, Olmos complains of the sufficiency of the evidence to support his conviction.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual Background

Olmos did not take the witness stand in his own defense. There were no third-party witnesses to the assault. The details of the incident in question were related to the jury by Alana Peters,[2] the victim, who testified to the following chronology of events from the evening of July 30, 2013.

Peters worked the night-shift at the U.S. Postal Service and lived with her mother in a three-bedroom home in southeast Fort Worth. On the day of the incident, Peters was at home alone enjoying a day off from work and watching *I Love Lucy* in her bedroom located in the back of the house.[3]

At approximately 4:00 a.m., a young man[4] wearing a black rosary necklace and a gray "muscle shirt" pulled over his face, but otherwise naked from the waist down, suddenly barged into her room.[5] He carried with him a roll of duct tape

---

[2]The complainant in this case used the pseudonym "Alana Peters." *See* Tex. Code. Crim. Proc. Ann. art. 57.02(b) (West Supp. 2014); 2nd Tex. App. (Fort Worth) Loc. R. 7.

[3]Her mother also worked the night shift, but it was not her day off.

[4]Peters later identified this man as Olmos.

[5]Peters testified that the television volume was loud in order to compensate for the noise of a box fan she had turned on to help cool her bedroom. Consequently, she did not hear Olmos enter the house and was not sure how Olmos gained entry. She suspected he may have been able to come in through the front door because the lock was flimsy. A Fort Worth Police Department officer testified that he observed that the clasp on the front door and the latch plate were "extremely loose," and the crime scene investigator also observed what appeared to be pry marks on the bolt area of the door frame.

and a knife, and he warned Peters, "If you don't cooperate, I will kill you. I don't want to kill you."

Olmos then pulled Peters to the side of the bed and began to duct-tape her mouth shut as she pleaded with him, "Don't do this. You're so young." Olmos replied, "B--ch, I'm 42 years old,[6] and . . . I just got back from the military. Just shut the hell up and cooperate with me." Olmos then covered Peters' eyes with duct tape, duct-taped her wrists behind her back, cut off her shirt with the knife, and removed her shorts.

After that, Peters heard Olmos leave her room and go outside. She testified that Olmos seemed "scatterbrained" and nervous, and it sounded to her as though he was talking to someone outside. In his absence, Peters had just managed to remove the duct tape from her wrists when he returned to her room. Upon seeing what she had done, he said, "What the hell did I tell you? If you don't cooperate, I'm going to hurt you." He then re-taped Peters' hands—this time in front of her body—and forced himself upon her, performing sexual intercourse and oral sex on Peters while she was blind-folded and bound at the wrists.

Afterwards, Olmos instructed Peters that he wanted to take a shower with her, so he forced her into the shower in her mother's bathroom. Then, without

---

[6]Olmos was 17 years old at the time.

turning the water on, Olmos took Peters back out of the shower. Peters described Olmos's behavior in this regard also as "scatterbrained."

At this point, he started asking her "where the guns were" and "where the kilos of coke were," and he claimed to be a member of the Zetas, a Mexican drug cartel. Peters pleaded with Olmos to take their car, televisions, a diamond ring she was wearing—anything he wanted, as long as he would leave—but Olmos continued to question her about the guns and "coke."

Olmos then returned Peters into her mother's bedroom, duct-taped her ankles together, and forced her to perform oral sex on him. As he did so, he placed the knife against her chest and warned her, "If you bite me, I will stab you. I'll kill you. You better not bite me." After she performed oral sex on him, Olmos cut the duct tape from around her ankles, lay down on the bed, and directed her to get on top of him and have sex with him. Peters complied.

While she was straddling Olmos, however, the duct tape covering Peters' eyes came loose. She could see enough to determine that he was no longer holding the knife because his hands were on her body. Peters used her hands to feel the area of the bed around Olmos's head and eventually felt the knife. She grabbed it, aimed for his neck, and managed to leave a 6-inch scratch before the handle broke off and the knife blade fell to the floor. Olmos rolled off to one side of the bed, and Peters rolled to the other side. Olmos yelled, "You f---ing b--ch, you tried to – You f---ing stabbed me."

4

Both Olmos and Peters went for the blade and wrestled for it. Olmos prevailed in the struggle and began stabbing at Peters. She used a nearby box fan to block some of the jabs, but Olmos managed to thrust the knife into her back, as well as into her right side, puncturing her lung.

During the struggle, Olmos placed Peters into a choke hold, but she was able to free herself momentarily. She seized the moment, along with his genitals, digging her fingernails into them, as if to "rip them off." As Olmos fell to the ground, Peters escaped down the hallway. However, the blood dripping from her wounds made the tile floor slick as she ran, causing Peters to slip and fall. This delay provided Olmos the opportunity to catch up with her and grab her again just as she had reached the front door.

As Olmos pulled Peters back into the house, he yelled at her, "You f---ing b--ch, you stabbed me in my neck." Then he began wielding the knife at her again. Peters sustained cuts and scratches to her forearm and wrists from her attempts to stave off the repeated blows. As a wounded and bleeding Peters continued to defend herself, she managed to reach the door once again. But, as before, Olmos pulled her from it. This time, he stabbed her in the chest and in the throat. Struggling to breathe, Peters said, "I'm dying," to which Olmos responded, "Good. You shouldn't have f---ing stabbed me, you f---ing b--ch."

Peters fell, hitting her head on the floor. She remained there, playing dead, in the hope that he would leave. He did, but not without delivering one last abuse to her body. He spat on her face as he walked away.

Two and a half hours—what "seemed like an eternity" to Peters—had elapsed before Olmos finally left the house. Naked, bloody, weak, and struggling to breathe, Peters staggered to her neighbors' house, where she knocked on the door and rang the doorbell. After no one answered, she collapsed. Another neighbor who was out walking his dog noticed her body lying on the porch and called 9-1-1.[7]

An ambulance arrived, and as Peters was being transported to the hospital, she provided the paramedics with a description of her attacker. Although she did not know him or anything about him, Peters said she had been able to get a good look at Olmos while they were fighting, and she recognized him from the neighborhood.

Fort Worth Police Detective Drew Savage, who was assigned to investigate the case, immediately began canvassing the neighborhood for information using the general description Peters had provided, asking neighbors whether they had seen or heard anything that evening. As a result of Detective Savage's efforts, Olmos was identified as a possible suspect, and two days later, Detective Savage located him living in a house just down the street from Peters' home. During the initial interview, Detective Savage observed injuries to Olmos's neck and hands and scratches on his body. Olmos was also wearing a black

---

[7]At some point in the struggle, Peters had managed to grab Olmos's grey muscle shirt and she was still clutching it when the neighbor found her.

rosary necklace that matched Peters' description. Peters identified Olmos in a six-person photo lineup presented to her on that same day.

DNA testing revealed that Olmos's DNA matched DNA found on the grey muscle shirt. Olmos's DNA also matched DNA from a "blob" of spit found on the floor of Peters' house, as well as from a vulvar swab collected from Peters while she was in the hospital.

Peters spent a week in the hospital recovering from a punctured lung, stab wounds to her heart, diaphragm, liver, and throat, and defensive wounds on her arms. Almost a year after the attack, Peters still felt pain when she laughed. She could not yawn normally or lift items over her head. She continued to experience numbness in her abdomen any time she moved around for more than twenty minutes. According to her doctors, the pain and the effects from the injuries Olmos inflicted upon her were chronic issues that Peters, who was 29 years old at the time of trial, would have to endure for the remainder of her life.

### III. Sufficiency of the Evidence

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument.[8] *See Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013); *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014)

---

[8]The indictment alleged, and therefore the State had to prove, that Olmos on or about July 30, 2015, did

> [i]ntentionally or knowingly cause the penetration of the female sexual organ of Alana Peters (pseudonym) by inserting Defendant's penis into Alana Peters (pseudonym) female sexual organ without the consent of Alana Peters (pseudonym) by compelling Alana Peters (pseudonym) to submit or participate by the use of physical force or violence or by threatening to use force or violence against Alana Peters (pseudonym) and Alana Peters (pseudonym) believed that the Defendant had the present ability to execute said threat, and the Defendant by acts or words placed Alana Peters (pseudonym) in fear that death or serious bodily injury would be imminently inflicted on Alana Peters (pseudonym) and the Defendant by acts or words occurring in the presence of Alana Peters (pseudonym) threatened to cause the death of or serious bodily injury to Alana Peters (pseudonym).

("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

A person commits aggravated sexual assault

(1) if the person:

    (A) intentionally or knowingly:

        (i) causes the penetration of the anus or sexual organ of another person by any means, without that person's consent;

        (ii) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or

        (iii) causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; [and]

        . . . .

(2) if:

    (A) the person:

        (i) causes serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal episode; [or]

        . . . .

        (iv) uses or exhibits a deadly weapon in the course of the same criminal episode;

Tex. Penal Code Ann. §22.021(a)(1)(A)(i-iii), (a)(2)(A)(i), (iv) (West Supp. 2014).

9

A person acts intentionally "with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* §6.03(a) (West 2011). He acts knowingly "with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist" or "with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* §6.03(b) (West 2011).

"Intent is most often proven through circumstantial evidence surrounding the crime." *Thompson v. State*, 423 S.W.3d 475, 479 (Tex. App.—San Antonio 2014, no pet.). In determining the sufficiency of the evidence to show an appellant's intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

In a single point, Olmos contends that the State failed to prove that he had the requisite culpable mental state, i.e., that he intentionally or knowingly inserted his penis into her female sexual organ.[9] Olmos argues that while Peters testified to what Olmos did to her, "she offered no testimony that supported a rational inference that [Olmos] acted knowingly or intentionally." Specifically, Olmos

---

[9]Olmos does not challenge the sufficiency of the evidence to support the remaining elements of the offense.

10

characterizes Peters' testimony as having "emphasized" that Olmos appeared "'scatterbrained', unorganized, even confused." Olmos argues that even giving due deference to the jury to decide fact issues, the evidence did not establish that he had committed these acts intentionally or knowingly.

Peters never testified that Olmos appeared "confused." Nor did she ever utter the term "unorganized."[10] While Peters did use the term "scatterbrained" twice during her testimony to describe Olmos's conduct, cross-examination by the defense provided context to the meaning she ascribed to that term:

> Q: So from your perspective, in going through this ordeal, it almost sounds like this wasn't even well thought out. Is that a fair statement?
>
> A. I don't know. It was kind of thought out, yes.
>
> Q: Well, what did you mean when you said he was scatterbrained?
>
> A: He just seemed—he just had—I could feel this nervous energy coming off of him, but I feel like it was thought out because he knew I was—obviously knew I was alone, and he had—it just seemed premeditated because he did have a roll of duct tape and a knife. But when he was in the house, he did seem very —

---

[10]With regard to Olmos's conduct that evening, the term "unorganized" was used only once, by the defense attorney on cross-examination:

> Q: And you've made reference during your testimony to phrases like he was scatterbrained, he was kind of unorganized.
>
> A: Uh-huh.
>
> Q: He was kind of stupid, sounds like. Is that a fair statement.
>
> A: Yeah, that's fair.

11

Q:  Agitated?

A:  Uh-huh.

Despite Peters' testimony that Olmos may have been "scatterbrained" or nervous, and certainly with the benefit of Peters' clarification regarding her use of that particular word, the record supports the jury's finding that Olmos acted intentionally and knowingly in sexually assaulting Peters. He planned it, as evidenced by the supplies and weapon he brought with him. He used the duct tape he brought with him to bind, blindfold, and gag her at various times throughout the ordeal. He used the knife to threaten her repeatedly with violence, even death, if she failed to cooperate with him. When she did refuse to cooperate and she fought back, he made good upon those threats, stabbing her multiple times and inflicting potentially lethal wounds. He explicitly ordered her to commit and submit to several sexual acts during the two-and-a-half-hour period of assault. And, in his final act, he spat upon her face as he left her for dead.

Based on this evidence, we hold that a rational trier of fact could have found beyond a reasonable doubt that Olmos acted intentionally or knowingly when he committed aggravated sexual assault, as charged in the indictment, against Alana Peters. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170. Therefore, we overrule Olmos's sole point.

## IV.  Conclusion

Having overruled Olmos's sole point, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  GARDNER, WALKER, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  October 1, 2015